## DONNA M. AUSTIN *vs.* CRAIG B. AUSTIN.

No. 03-P-1195.

Barnstable. April 14, 2004. - December 29, 2004.

Present: BECK, DUFFLY, & MILLS, JJ.

Further appellate review granted, 443 Mass. 1107 (2005).

*Divorce and Separation,* Alimony. *Minor,* Visitation rights. *Contract,* Antenuptial agreement. *Husband and Wife,* Antenuptial agreement.

In a divorce action, the judge did not abuse his discretion in fashioning a custodial arrangement. [722]

Discussion of the validity of antenuptial agreements generally and of the enforceability of provisions in such agreements waiving the right to receive alimony. [722-728]

In a divorce action, the judge correctly determined that under the circumstances known and reasonably to be anticipated by the parties at the time of the execution of an antenuptial agreement, the waiver of alimony provision was, as to the wife, neither fair nor reasonable when it was made, and that it was therefore invalid [728-731]; moreover, the judge's findings regarding the award of alimony were supported by the evidence [731].

COMPLAINT for divorce filed in the Barnstable Division of the Probate and Family Court Department on May 31, 2001.

The case was heard by *Robert E. Terry,* J.

*Jacob M. Atwood* (*Erin Moran Shapiro* with him) for Craig B. Austin.

*Dana Alan Curhan* (*Bryna S. Klevan* with him) for Donna M. Austin.

DUFFLY, J. In this appeal from a divorce judgment ending his twelve and one-half year marriage to Donna Austin, Craig Austin challenges the award of alimony to Donna, arguing that the waiver of alimony provision contained in the parties' antenuptial agreement (agreement) was valid when made and must be enforced.[1] We conclude that, on the facts of this case, the

---

[1] He also appeals from the provisions of the judgment governing visitation with the parties' minor child.

Probate Court judge's decision invalidating the premarital waiver of alimony was not erroneous.

1. *Background facts and proceedings.* When the parties met in 1984, Donna was employed in the fragrance department of a department store and Craig was working in his family produce business, Sun Valley Produce Co., Inc. (Sun Valley). Eventually, Donna and her daughter from a prior marriage moved in with Craig. In 1988, concerned that the relationship would not result in marriage, Donna and her daughter moved out. Donna and Craig continued to see each other, however, and in January, 1989, they became engaged.

Not long before the May, 1989, wedding date, Craig informed Donna that he wanted her to sign an antenuptial agreement as a condition of his offer of marriage, expressing concern about "his business interests with his family." Donna and Craig exchanged financial statements, which then became exhibits to the agreement. Craig's financial statement disclosed assets, on which he placed a total value of close to one million dollars, that included a fifty percent interest in Sun Valley; his condominium; an interest in two other real estate parcels; a fifty percent interest in two businesses owned with his brother Steven — Austin Sportswear, Inc. (established in 1984), and T'Shirt Academy of Nantucket (which commenced operation in 1989); as well as bank accounts and other liquid investments, two expensive automobiles, furniture, and furnishings. Donna had a modest net worth (a ten year old car, jewelry and furs, and a small bank account).

The agreement contains waivers of alimony by both parties.[2,3] The agreement usurped no rights of the parties with respect to any children that might be born to them. The parties agreed that

---

[2]The agreement also contains a provision that if, at the time of divorce, the marital home is solely owned by Craig, Donna must "vacate said residence forthwith," and in such event, Craig would become obligated to pay support. Craig makes no argument that this clause has any relevance to our consideration whether the alimony waiver provision was valid when made. We note that whether under this clause Donna would ever be entitled to support is subject to contingencies entirely within Craig's control; there is also nothing in the agreement requiring Craig to provide a home for Donna.

[3]Neither party has raised any argument with respect to the meaning to be given to the following provision in the antenuptial agreement: "Both parties further understand that any waiver or modification of their right to seek

Craig would retain all of his separate property, as well as any "increase in value of property acquired in exchange" for his separate property. Any other property that might be acquired by the parties was subject to division under applicable divorce laws, including appreciation in value to the marital home.

Donna was thirty-seven and Craig thirty-five years old when they were wed; each had been married once before. Following their marriage, the parties lived for a time in the Jamaica Plain section of Boston where, in April, 1991, their daughter was born. In July, 1995, the family moved into a home they had built in East Sandwich on Cape Cod. This was the marital home at the time of the divorce. See note 2, *supra*. Craig continued to work at Sun Valley, but he also purchased and renovated a restaurant on the Cape, which commenced operation in December, 1999, as Amari's Bar & Ristorante.

Donna was employed outside the home for a brief period after the marriage. Following the birth of their daughter, the parties were in agreement that Donna should leave the workforce and become the primary caretaker of their daughter and a full-time homemaker.

Donna initiated divorce proceedings in May, 2001, seeking an end to the marriage, custody of the parties' minor child, support and alimony, and an equitable share of the marital estate. In his counterclaim, Craig sought enforcement of the parties' agreement, custody of the minor child, and child support.

A judge of the Probate and Family Court conducted a bifurcated trial, first considering evidence on the issue of the validity and enforceability of the antenuptial agreement. He concluded that provisions relating to property were valid but that the waiver of alimony provision was unfair and unreasonable when made and therefore not valid. The matter then proceeded to a trial on the merits of the divorce. Under the divorce judgment, Craig was assigned his separate property; the

spousal maintenance, as contained herein, may be voidable under certain circumstances and may be subject to reconsideration by a court of competent jurisdiction."

marital assets were apportioned between the parties.[4] In addition, Donna was awarded child support in the amount of $500 per week and alimony in the amount of $1,000 per week. Craig appeals from the provisions of the judgment awarding alimony to Donna and providing for specified visitation between Craig and the minor child.

2. *Discussion.* (a) *Visitation.* Under the divorce judgment, the parties have joint legal and shared physical custody of the minor child, "although the child shall reside primarily with [Donna] during the school year." The judgment includes detailed orders governing the times the child will spend with each parent and provides that during the school year, she is to reside with Craig from Sunday at 9:00 A.M. to Monday at 7:00 P.M.; during the summer, the period is extended to Tuesday at 9:00 P.M. Holidays and school vacation periods are likewise provided for. Describing this arrangement as a "minimal visitation arrangement," Craig argues that the findings do not support the custodial arrangements ordered by the judge.

A trial court's broad discretion to fashion an appropriate custody or visitation arrangement will not be disturbed on appeal unless clearly wrong. See *Rolde* v. *Rolde*, 12 Mass. App. Ct. 398, 391 (1981) (judge ruling on custody and visitation has opportunity to observe and appraise both parents; discretionary order awarding sole custody to wife was not "clearly wrong"). See also *Youmans* v. *Ramos*, 429 Mass. 774, 787 (1999) (best interests standard applicable to child custody arrangements is classic example of discretionary decision). As we discern no abuse of that discretion here, we affirm those portions of the judgment relating to the custodial arrangements of the child.

(b) *Validity of alimony waiver.* Although the right to vary the property rights of spouses by premarital contract has long existed at common law, see *French* v. *McAnarney*, 290 Mass.

---

[4]Under the terms of the corrected judgment of divorce nisi, Donna's share of the assets included the marital home (encumbered by a mortgage). The judge determined that the marital home was jointly held during the marriage until transferred to a trust benefiting the parties; had been built with marital funds; and was a marital asset subject to division, rulings that Craig does not contest. Neither party appeals from the judgment insofar as it deals with property division.

544, 547 (1935),[5] until relatively recently most jurisdictions considered provisions in antenuptial agreements limiting liability for spousal support (whether during marriage or upon divorce) to be void as against public policy.[6] This was, in part, because such agreements were seen as facilitating divorce. See *id.* at 548, and cases cited. Beginning in the 1970's, however, courts began to uphold antenuptial agreements containing limitations on alimony noting that, with the increase in the rate of divorce and the advent of no-fault divorce laws in many States, there was no longer a strong public policy basis for voiding such agreements. See Clark, Jr., Domestic Relations in the United States § 1.9, at 48-49 (2d ed. 1987). See also *Posner* v. *Posner*, 233 So. 2d 381, 385 (Fla. 1970) (prenuptial limitation on alimony upheld subject, however, to same "change in circumstances" test applicable after divorce to postnuptial agreements), and other cases cited in *Osborne* v. *Osborne*, 384 Mass. 591, 597 (1981). Some courts regarded antenuptial agreements as ordinary contracts and concluded that such agreements should be enforceable to the same extent as, and subject only to limitations applicable to, commercial contracts.[7] See, e.g., *Simeone* v. *Simeone*, 525 Pa. 392 (1990). That approach is reflected in the Uniform Premarital Agreement Act (UPAA), 9C U.L.A. 35 (Master ed. 2001), promulgated in 1983 by the National Confer-

---

[5]It has been authorized by statute since 1845. General Laws c. 209, § 25, provides:

> "At any time before marriage, the parties may make a written contract providing that, after the marriage is solemnized, the whole or any designated part of the real or personal property or any right of action, of which either party may be seized or possessed at the time of the marriage, shall remain or become the property of the husband or wife, according to the terms of the contract. Such contract may limit to the husband or wife an estate in fee or for life in the whole or any part of the property, and may designate any other lawful limitations. All such limitations shall take effect at the time of the marriage in like manner as if they had been contained in a deed conveying the property limited."

[6]A discussion of case law in effect in 1968, which in general imposed limitations on the scope of antenuptial agreements, is set forth in Clark, Jr., Domestic Relations in the United States § 1.9, at 28-29 (1968).

[7]For a discussion of cases reflecting this shift in the law, see Marriage as Contract and Marriage as Partnership: The Future of Antenuptial Agreement Law, 116 Harv. L. Rev. 2075, 2077-2080 (2003).

ence of Commissioners on Uniform State Laws. Under the UPAA, an antenuptial agreement will be enforced unless it was entered into involuntarily or "unconscionable when it was executed." UPAA § 6(a)(2), 9C U.L.A. 49.[8]

Massachusetts decisional law has consistently adhered to the view that "[m]arriage is not a mere contract between two parties, but a legal status from which certain rights and obligations arise." *DeMatteo* v. *DeMatteo*, 436 Mass. 18, 31 (2002), citing *French* v. *McAnarney*, 290 Mass. at 546.[9] See *Osborne* v. *Osborne*, 384 Mass. at 599 (the freedom to limit or waive legal rights in the event of divorce "is not appropriately left unrestricted"). Rejecting the unconscionability standard that was contained in the UPAA, in part because it is used in commercial law, the Supreme Judicial Court observed that "[a]ntenuptial agreements by their nature concern confidential relationships, and a standard for testing the validity of a business agreement seems to us inappropriate in this context." *DeMatteo* v. *DeMatteo*, *supra* at 33. See American Law Institute Principles of the Law of Family Dissolution: Analysis and Recommendations (ALI) § 7.04, Reporter's Notes to comment g, at 982 (2002) (agreements about marriage are more likely than commercial agreements to involve special facts that test the limits of the bargain principle; effect of UPAA is "to narrow significantly the ability of courts to police extremely unfair agreements, even as compared to the ambit of judicial review in

---

[8]Our Legislature has not adopted the UPAA. Among States that have adopted the UPAA, several have modified it to provide greater judicial oversight to prevent extremely unfair agreements. See, e.g., Cal. Family Code § 1612(c) (West 2004); Ill. Ann. Stat. 750, par. 10/7(b) (Smith-Hurd 1999); Ind. Code Ann. § 31-11-3-8(b)(2) (Burns 2003); 26 N.J. Stat. Ann. § 37:2-32(c) (West 2002).

[9]In *French* v. *McAnarney*, *supra*, the court invalidated an antenuptial agreement that contained a waiver by the wife of her right to be supported during the marriage, concluding that "[m]arriage is not merely a contract between the parties. It is the foundation of the family. It is a social institution of the highest importance. The Commonwealth has a deep interest that its integrity is not jeopardized." *Id.* at 546. Relying on cases from other jurisdictions that invalidated antenuptial agreements restricting alimony in the event of divorce, the court held that "a contract to relieve the [husband] from the obligation to support his wife after marriage" is against public policy. *Id.* at 548.

the commercial context").[10] Compare *Wilcox* v. *Trautz*, 427 Mass. 326, 334 (1998) ("agreement between [unmarried partners] is enforceable so long as it conforms with the ordinary rules of contract law, and a court is no more entitled to inquire into its fairness and reasonableness than it is in respect to contracts generally").

Instead, whether an antenuptial agreement is valid will depend upon whether it was "fair and reasonable" when it was executed, in addition to factors not at issue here, such as whether it was voluntarily made or based upon full disclosure. *DeMatteo* v. *DeMatteo, supra* at 32-33. In the context of assessing the validity of an antenuptial agreement, the provisions for alimony need not approximate an award made pursuant to factors set forth in G. L. c. 208, § 34, applicable upon divorce. *DeMatteo* v. *DeMatteo, supra* at 31. Rather, the test is whether an agreement "essentially strips the contesting spouse of substantially all of her marital interests."[11] *Id.* at 37. As the court noted in its discussion of the enforceability of such agreements, chief among the marital rights to which a spouse is entitled upon marriage is the right to maintenance and support. *Ibid.* See Clark, Jr., Domestic Relations in the United States § 1.9, at 29 (1968) (support regarded "as an essential obligation of the marital relation, one having greater significance than property rights").[12]

Alimony by its nature is a right that does not exist prior to

---

[10]In this respect, the standard articulated in *DeMatteo, supra,* and *Osborne, supra,* is consonant with that proposed by the ALI. See ALI § 7.05 comment b, at 987 ("in contrast to the premarital agreement containing terms that apply only to the consequences of a presently unexpected dissolution, the usual long-term commercial agreement has immediate as well as continuing relevance. It typically governs an ongoing relationship with terms that apply every day, *until* the parties' relationship ends, while the premarital agreement's terms apply *only if* the relationship is dissolved").

[11]The agreement strips Donna of any claims to all of the significant assets known to the parties at the time the agreement was executed.

[12]In the context of assessing the validity of antenuptial agreements, the cases appear to treat premarital limitations on property as matter distinct from premarital limitations on alimony. Substantially all jurisdictions now uphold antenuptial agreements that place limitations on the extent to which one spouse may seek an interest in property owned by the other spouse prior to the marriage, whereas limitations on alimony are not uniformly approved or if authorized, are more closely scrutinized. See Clark, Jr., *supra* at § 1.9, at 52-53. This seems in part due to the fact that most such provisions seek only to protect the wealthy spouse's *existing* assets from future distribution to the

marriage; in many cases, it also does not derive from the separate property of a wealthy spouse, compare *Osborne* v. *Osborne, supra,* but from income earned during the marriage. Such income, and any asset purchased with that income, is an asset of the marriage. See *Yousif* v. *Yousif,* 61 Mass. App. Ct. 686, 698 (2004). As such, alimony is unlike premarital property, and a waiver of the right to receive alimony is a waiver not of a present, known right, but of a future right, the value of which may not be ascertainable for many years to come.[13] In this respect, it is akin to property that may be acquired during the marriage by the joint efforts of the domestic partners: both may accumulate in value over time as the parties contribute to the marital enterprise, amassing both assets and increased earning power.

Because enforcement of a valid antenuptial agreement may not occur until long after it was entered into, it is all the more important that parties entering into such agreements make appropriate provision for support if, in the light of the known and anticipated circumstances, it would be fair and reasonable to do so should the marriage end in divorce.[14] It is for these reasons that, where an agreement seeks to deprive one party of interests

other spouse, a limitation courts have viewed with approval. See *id.* at 41. See also *DeMatteo* v. *DeMatteo, supra* at 31 (relinquishment of claims to substantial existing assets of future spouse does not necessarily render antenuptial agreement invalid; such "agreement may be most desired when a wealthy individual contemplating marriage seeks to ensure that, if the marriage is not successful, his or her own assets will not accrue to the spouse"); *Button* v. *Button,* 131 Wis. 2d 84, 96 (1986) ("A party should be able to enter into an agreement . . . which preserves property acquired before marriage for persons other than the spouse").

[13]The common law obligation to support a dependent spouse has, under G. L. c. 208, § 34, evolved into a valuable right on divorce, the extent of which is to be determined in light of various factors enumerated in that statute.

[14]In *Button* v. *Button,* 131 Wis. 2d at 97, Justice Abrahamson proposes that, in addition to considering "the circumstances existing at the execution of the agreement and those reasonably foreseeable," it is also appropriate to take into account "that the duration of the marriage is unknown and [the parties] wish the agreement to govern their financial arrangements whether the marriage lasts a short time or for many years. The parties should consider such factors as the objectives of the parties in executing an agreement, the economic circumstances of the parties, the property brought to the marriage by each party, each spouse's family relationships and obligations to persons other than to the spouse, the earning capacity of each person, the anticipated contribution

that may accrue to the spouses through their combined efforts during their marriage, we will scrutinize the challenged provision to determine whether it was fair and reasonable when made.

In so doing, we do not consider the circumstances at the time of the divorce, including whether either party has accumulated additional assets since the agreement was made. That inquiry occurs during the "second look" stage, when a court deciding whether and to what extent to enforce a valid term of the agreement must assess if it is "conscionable" to do so. *DeMatteo* v. *DeMatteo*, 436 Mass. at 38.

Whether a limitation on spousal support made prior to marriage was fair and reasonable when made must be determined with reference to the known circumstances of the parties at the time, as well as those circumstances reasonably foreseeable. See *DeMatteo* v. *DeMatteo*, *supra* at 30, quoting from *Rosenberg* v. *Lipnick*, 377 Mass. 666, 672 (1979) ("the reasonableness of any monetary provision in an antenuptial contract cannot ultimately be judged in isolation"). See also note 14, *supra*.

This is not to suggest that alimony waivers are per se unreasonable.[15] Indeed, the alimony waiver in the *Osborne* case was upheld by the court as valid at the time of execution on evidence that supported the determination that the waiver was fair and reasonable when it was made. The wife in that case

by one party to the education, training or increased earning power of the other, the future needs of the respective spouses, the age and physical and emotional health of the parties, and the expected contribution of each party to the marriage, giving appropriate economic value to each party's contribution in homemaking and child care services."

Although we do not require that the foregoing factors be considered by a judge when determining the validity of an agreement, see *Rosenberg* v. *Lipnick*, 377 Mass. 666, 672 (1979) (listing factors), an attorney representing a client desiring to enter into an antenuptial agreement will better protect against the possibility that provisions of the agreement may be held invalid by crafting a document that reflects consideration of the foregoing factors.

[15]Parties might agree that, although a court could decide otherwise, see *Rosenblatt* v. *Kazlow-Rosenblatt*, 39 Mass. App. Ct. 297, 301 (1995) (even in short-term marriages the parties' standard of need is not to be measured by status prior to marriage, but by standard enjoyed during the marriage), in the event of a short-term marriage, alimony will be waived, whereas if the marriage continues for a specified period of years before ending in divorce, alimony will be paid.

was the heiress to a large family fortune, mostly held in trust; her trust income was $540,000 per year. 384 Mass. at 594. The husband had few assets. The parties met and became engaged while both attended medical school. Their antenuptial agreement included the statement that "[the wife] now has sufficient property to provide adequate means for her own support and [the husband], by reason of his becoming a member of the medical profession, contemplates that he will have adequate earning power for his own support." *Ibid.* It was not unreasonable to anticipate that the husband would be able to support himself as a medical doctor, and not unfair to agree that he would not look to his wife's trust income to supplement his earnings in the event of divorce.

Unlike the husband in *Osborne*, however, here there was nothing in the evidence to suggest that Donna would be in a position to reasonably support herself in the event of a divorce occurring well into the future. In this respect, the circumstances are more like those in *DeMatteo*, where (in relation to the husband's wealth) the wife had been earning only a modest income of $25,000 a year as a secretary just prior to marrying the husband. 436 Mass. at 19-20. Under the terms of the *DeMatteo* antenuptial agreement, the wife was to receive one-half of the jointly held property at the time of divorce as well as housing and transportation; in addition, the husband was obligated to continue to provide for the wife's health insurance and her support until her death or remarriage ($35,000 per year when the parties married in 1990, subject to annual cost of living adjustments to 1998, the date the husband filed for divorce). *Id.* at 20-21. The agreement took into account the wife's age (forty-one years) and limited earning capacity, and anticipated that the wife would in all likelihood not be working during the marriage and thus would not be in a position to provide reasonably for her own support in the event of divorce. The agreement made reasonable provision for the wife's support in the event of divorce, including alimony, in amounts that exceeded what she had been earning before the marriage; it fairly provided for cost of living increases to the alimony amount, adjusted annually to the date either party sought to end the marriage, to account for the effects of inflation. *Id.* at 22.

Here, the judge assessed both the agreement's validity as well as whether it was enforceable. These are distinct assessments to which, as clarified in *DeMatteo, supra,* different standards are applicable.[16] In assessing the validity of the alimony waiver, the probate judge correctly considered whether it was fair and reasonable when made.[17] While Craig incorrectly ascribes findings relating to *enforceability* to the judge's determination of the *validity* of the agreement, he does not claim that the judge's subsidiary findings have no basis in the evidence. Rather, he argues that the judge used the wrong standard when concluding that the alimony waiver was invalid.

---

[16]Because we decide that the judge used the correct "fair and reasonable" standard in assessing whether the alimony waiver was valid, we do not reach the argument that the judge used an incorrect standard in assessing whether the agreement should be enforced at the time of the divorce.

We note that under *DeMatteo,* "the term 'conscionability' is [the] appropriate term to describe the standard at the time of enforceability." 436 Mass. at 38. As defined in *DeMatteo,* "conscionability" precludes consideration of "the fact that this is a ten year marriage which produced two children." *Ibid.* Whether considerations of conscionability would preclude enforcement of a valid alimony waiver if at the time of divorce the parties were married over thirty years and a dependant spouse of advanced years has not been employed outside the home for many decades, has not been the subject of any published opinion by our courts. Compare ALI § 7.05(2), at 982-984, articulating standard of enforceability and proposing that the following circumstances are appropriate to a consideration whether enforcement would work a substantial injustice:

> "(a) more than a fixed number of years have passed, that number being set in a rule of statewide application;

> "(b) a child was born to, or adopted by, the parties, who at the time of execution had no children in common;

> "(c) there has been a change in circumstances that has a substantial impact on the parties or their children, but when they executed the agreement the parties probably did not anticipate either the change, or its impact."

[17]He further found that, prior to executing the antenuptial agreement two days before the wedding, "both parties sought the advice of legal counsel"; the parties had made fair disclosure of their assets; and Donna was aware of her rights to alimony, support, and property division and on this basis her waiver was "knowing, voluntary and intelligent." These are additional prerequisites to finding an antenuptial agreement valid. We are not solely concerned with whether Donna entered the agreement freely and knowingly but also whether, objectively viewed, the agreement was fair and reasonable when it was made.

The judge in this case determined that under the circumstances known and reasonably to be anticipated by the parties at the time of the execution of the agreement, the waiver of alimony provision was, as to Donna, neither fair nor reasonable when it was made. As reflected in the judge's findings and the evidence from which they are drawn, the agreement strips Donna of all alimony rights despite the fact that she had no education beyond high school, had only been employed in entry level jobs when the parties met, and owned no property of value. That her contribution to the marriage would primarily be in the form of homemaking and child-rearing is evidenced by the fact that, immediately after the marriage, Donna commenced a year-long treatment for infertility that required Craig to give her injections on a regular basis, and as the probate judge found, it was by agreement of the parties that, after giving birth to their daughter, Donna became her primary caretaker and a full-time homemaker. In contrast, Craig was a business entrepreneur and had completed two years of college; he had for some time been employed in the family business, had started other businesses, and by the time of the marriage had already amassed assets on which he placed a value of close to one million dollars. He disclosed no interest in any family trusts at that time, and the sole source of his income was from employment. Based on this history at the time of the marriage, Craig's reasonably anticipated role in the partnership was as the primary income-earner.

As the judge found, it was reasonable for Craig to seek to protect his assets, including his interest in the family-owned business, from claims by Donna in the event of divorce (claims that might potentially also affect the interests of other family members). It was, however, unreasonable to expect that his spouse, who then had no assets and negligible earning capacity, would contribute to the marriage by raising his child and by supporting his ability to work outside the home, with no expectation of future support no matter how long the marriage, and regardless whether she might never acquire assets of her own.

The probate judge applied the appropriate standard, and his conclusion that the waiver of alimony was neither fair nor

reasonable at the time it was made is supported by the evidence. The judge did not err in concluding that the provision waiving alimony was invalid.

(c) *The alimony award.* Having invalidated the alimony waiver as to Donna, the judge was next called upon to decide whether and in what amount Craig should pay alimony. The judge was not constrained, in these circumstances, to limiting the alimony award to an amount sufficient only to prevent her from "becom[ing] a public charge," *DeMatteo* v. *DeMatteo,* 436 Mass. at 35. Instead, factors found in G. L. c. 208, § 34, apply and, as these factors were considered by the judge and his findings are amply supported by the evidence, we will uphold the judgment as to alimony.

*Corrected judgment of
divorce nisi affirmed.*