## Donna M. Austin *vs.* Craig B. Austin.

Barnstable. October 5, 2005. - December 21, 2005.

Present: Marshall, C.J., Greaney, Ireland, Spina, Cowin, Sosman, & Cordy, JJ.

*Divorce and Separation,* Alimony. *Contract,* Antenuptial agreement. *Husband and Wife,* Antenuptial agreement.

A probate judge erred in holding that an antenuptial agreement was unenforceable insofar as it precluded the wife from receiving alimony, in circumstances where the agreement was valid at the time it was executed and fair and reasonable at the time of the divorce. [603-608] Greaney, J., dissenting, with whom Spina, J., joined.

Complaint for divorce filed in the Barnstable Division of the Probate and Family Court Department on May 31, 2001.

The case was heard by *Robert E. Terry,* J.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*Jacob M. Atwood (Mark T. Smith & Erin Moran Shapiro* with him) for Craig B. Austin.

*Dana Alan Curhan (Brad P. Bennion* with him) for Donna M. Austin.

Ireland, J. As part of the parties' judgment of divorce nisi, a Probate and Family Court judge held an antenuptial agreement (agreement) was invalid only insofar as it precluded the wife from receiving alimony. The husband appealed from the judgments, including the judge's award of alimony to the wife, and the Appeals Court affirmed. *Austin* v. *Austin,* 62 Mass. App. Ct. 719 (2004). We granted the husband's application for further appellate review, limited to the enforceability of the agreement. Because we conclude that the agreement was valid at the time it was executed and fair and reasonable at the time of divorce, we vacate so much of the judgment that awards alimony payments to the wife.

*Facts and procedural background.* The parties met in 1984

and lived together from 1986 until 1988. They were married in May, 1989. Two days prior to the marriage, on May 11, 1989, the couple executed the agreement. The judge found that the husband made the marriage conditional on the signing of the agreement and that the wife "was not thrilled" about signing. Both parties sought the advice of legal counsel, but it was the draft prepared by the wife's counsel that the parties executed. Separate lists of each of the parties' assets were attached to the agreement as exhibits. The husband's assets were worth approximately $1 million, including interests in various family businesses. The wife's assets totaled approximately $35,000, most of which consisted of furs and jewelry. See *Austin* v. *Austin, supra* at 720 (listing the parties' assets).

The agreement allowed the separate property listed on the parties' exhibits to the agreement to be retained separately. In addition, "[t]he separate property of each party . . . , including [the] increase in value of property acquired in exchange therefor, shall remain the sole and separate property of the party in whose name it is titled."

All other property was to be deemed marital property and subject to "division under the laws of the jurisdiction which ultimately terminates . . . the marriage." The agreement provided, in relevant part, that any appreciation on the last marital home at the time of separation would be deemed a marital asset, subject to division. A key provision was that, if the marital residence was owned solely by the husband at the time of separation, although the wife would have to vacate the home,[1] the husband was required to assist the wife in relocating and to give the wife "support based upon such considerations as the length of the marriage, their present employment, whether any children were born to the marriage and such other factors as are cognizable under domestic relations and property laws of the jurisdiction in which the parties last resided."[2] Both parties waived alimony from the other.[3]

---

[1] After the parties were married, they lived in a condominium unit owned by the husband.

[2] The agreement preserved the parties' rights concerning support and custody of their child.

[3] The paragraph waiving alimony states that both parties "understand that any waiver or modification of their right [to alimony] may be voidable under

Over the course of their twelve-year marriage, the couple had one child, born in 1991. By agreement, the wife stayed home as a full-time mother, helping out occasionally at the family's restaurant, which opened in 1999, and other businesses. In addition, in 1995, the couple bought a house in East Sandwich, which was the marital home at the time the wife filed for divorce in 2001. During the marriage, the family enjoyed "an upper class lifestyle."

In a bifurcated trial, the judge first considered evidence whether the agreement was valid. The judge found that the parties made informed, voluntary decisions to sign the agreement, that they represented their net worth to the best of their abilities, and that the wife was "under neither duress [n]or coercion when she signed the agreement."[4] He also found that the wife was fully advised of her rights when she executed the agreement and that the wife, having been divorced previously, was fully aware of her rights to alimony, support, property division, and child support. The judge found that, as it related to the division of property, the agreement was fair and reasonable at the time of execution. However, although he further found that the wife's "waiver of alimony at that time was a knowing, voluntary and intelligent waiver," the judge concluded that the waiver of alimony was unfair and unreasonable at the time the agreement was executed.

After a trial on the merits of the divorce, the judge divided the marital assets. Relevant to our discussion is the fact that the wife was awarded, among other things, the marital home, valued at $1,275,000,[5] $525,000 in cash, and her Lexus automobile (subject to a loan balance of $24,575). The judge also awarded the wife $500 per week in child support and $1,000 per week in alimony. The husband's appeal from the alimony provision is the sole issue before this court.[6]

*Discussion.* Antenuptial agreements that waive alimony are

certain circumstances and may be subject to reconsideration by a court of competent jurisdiction."

[4]For purposes of this appeal, the wife does not contest the judge's findings that she was fully informed of the husband's net worth prior to marriage and that the agreement contains a waiver.

[5]The marital home is subject to a $154,000 mortgage.

[6]The husband also appealed from the judge's decision concerning visitation

not "per se against public policy and may be specifically enforced." *Osborne* v. *Osborne*, 384 Mass. 591, 598 (1981). However, to be enforceable, the agreement must be valid at the time of execution and must also be fair and reasonable at the time of divorce. *DeMatteo* v. *DeMatteo*, 436 Mass. 18, 26 (2002). In order to be valid at the time of execution, the judge must determine whether "(1) [the agreement] contains a fair and reasonable provision as measured at the time of its execution for the party contesting the agreement; (2) the contesting party was fully informed of the other party's worth prior to the agreement's execution, or had, or should have had, independent knowledge of the other party's worth; and (3) a waiver by the contesting party is set forth." *Id.*, quoting *Rosenberg* v. *Lipnick*, 377 Mass. 666, 672 (1979). In determining whether an agreement was fair and reasonable at the time of execution, "reference may appropriately be made to such factors as the parties' respective worth, . . . ages, . . . intelligence, literacy, business acumen, and prior family ties or commitments." *Rosenberg* v. *Lipnick, supra* at 672. An agreement, even a one-sided agreement that leaves the contesting party with "considerably fewer assets" and imposes a "far different lifestyle after divorce" than she had during the marriage, is fair and reasonable unless "the contesting party is essentially stripped of substantially all marital interests." *DeMatteo* v. *DeMatteo, supra* at 31.

Where an agreement is valid at the time of execution, a judge must take a second look at its provisions at the time of divorce. *Id.* at 34-35. At that time, the agreement will be enforced "unless, due to circumstances occurring during the course of the marriage, enforcement . . . would leave the contesting spouse 'without sufficient property, maintenance, or appropriate employment to support' herself." *Id.* at 37, quoting 1 H.H. Clark, Jr., Domestic Relations in the United States § 1.9 (2d ed. 1987). We turn first to the validity of the agreement at the time it was executed.

In concluding that the agreement was not fair and reasonable as to alimony for the wife at the time of its execution, the judge

with his child. That issue was decided by the Appeals Court and was not raised in the husband's application for further appellate review. *Austin* v. *Austin*, 62 Mass. App. Ct. 719, 722 (2004).

stated: "Although at the time it may have been reasonable to for[]go alimony because she was employed and was young and healthy, . . . it was not fair and reasonable at the time of execution for [the wife] to for[]go all possible alimony and support given the great disparity of earning potential of the parties." The wife was employed at a department store in Boston, and the husband had various business interests. The judge noted that the wife entered the marriage intending to build a life with the husband and "rightfully believed that what they built together would belong to both of them," but that the husband made "it his mission . . . to prevent the creation of joint marital assets."[7] Although it is important to our analysis, the judge did not address the provision of the agreement that created support for the wife based on, among other things, length of marriage and employment, in the event a jointly owned marital home did not exist at the time a divorce complaint was filed.

The judge's findings do not permit the conclusion that the wife was "essentially stripped of substantially all marital interests," which is the standard required to declare an agreement invalid at its execution.[8] *DeMatteo* v. *DeMatteo*, *supra* at 31. Disparity of income that has the potential to leave one spouse in an essentially different lifestyle is not a valid basis for determining that the agreement was invalid at its execution. *Id.* Moreover, "[w]here there is no evidence that either party engaged in fraud, failed to disclose assets fully and fairly, or in

---

[7]The judge did not find that the husband breached the prenuptial agreement or fraudulently diverted or concealed marital assets. In such circumstances, the judge would have the equitable power to design a remedy, such as adjusting the distribution of assets, regardless of whether the agreement itself was valid either at its execution or at the time of divorce. See *Anderson* v. *Anderson*, 354 Mass. 565, 567 (1968) (discussing Probate Court's equity jurisdiction); *Bak* v. *Bak*, 24 Mass. App. Ct. 608, 624 (1987) (affirming court's judgment that real estate that husband fraudulently transferred to his mother be held against husband's alimony payments); C.P. Kindregan, Jr., & M.L. Inker, Family Law and Practice § 71:2 (3d ed. 2002 & Supp. 2005) (same).

[8]The judge's decision concerning the agreement's validity was issued approximately one month before our decision in *DeMatteo* v. *DeMatteo*, 436 Mass. 18 (2002). The *DeMatteo* case was called to the court's attention by the husband in motions he filed in August, 2002. Neither party contests the fact that the *DeMatteo* decision, which clarified the standards to be applied to antenuptial agreements, applies to this case. *Id.* at 30-31, 35. See generally *Schrottman* v. *Barnicle*, 386 Mass. 627, 630-631 (1982).

some other way took unfair advantage of the confidential and emotional relationship of the other when the agreement was executed, an agreement will be valid unless its terms essentially vitiate the very status of marriage." *Id.*

Here there is no evidence of the husband's taking unfair advantage of the wife at the time the agreement was executed. The wife's attorney drafted the agreement, after he had advised her not to sign an agreement prepared by the husband's attorney. Furthermore, as discussed, the judge found that the wife was fully aware of her rights and knowledgeable about alimony, property division, and child support. The agreement provided that the wife's separate premarital property would remain hers and not be incorporated into marital assets. Cf. *Rice* v. *Rice*, 372 Mass. 398, 400 (1977) (judge has "discretion to assign to one spouse property of the other spouse whenever and however acquired"). The agreement permitted the wife a joint interest in marital assets and provided that "any appreciation on the marital home or such home as the parties reside as their last marital home at the time of separation, whether due to market forces or capital investment," be divided as a marital asset, even if the husband held sole title to the property. Most important, the agreement entitled the wife to relocation and "support" from the husband if there were no jointly owned marital home at the time of a divorce, "based upon such considerations . . . as are cognizable under domestic relations and property laws" of the relevant jurisdiction. In short, the agreement provided for either funds from a capital asset or access to support, utilizing standard factors such as those now codified in Massachusetts in G. L. c. 208, § 34. When they were married, the couple resided in the husband's condominium unit. Therefore, it was reasonably foreseeable that a home owned by the husband would exist in the event of a divorce. There is nothing in this record that would allow us to conclude that the agreement vitiated the status of marriage by stripping the wife of "substantially all marital interests." *DeMatteo* v. *DeMatteo, supra* at 31. Accordingly, the agreement was valid at the time it was executed. Had the wife been dissatisfied with the terms of the agreement, she could have refused marriage. See *id.* at 34.

Our conclusion that the agreement is valid requires us "to

consider whether there is any reason not to enforce it." *Id.* We begin by noting that, although he was not required to do so after he found the agreement to be invalid at the time of execution, the judge also found that the agreement concerning alimony was invalid at the time of divorce. He stated that the wife had spent ten of the twelve years of marriage as a homemaker, completely dependent on the husband, and given her lack of education,[9] was "not in a position to secure income which would maintain the lifestyle that she achieved [for her and her daughter] during the marriage."

In the *DeMatteo* case, the court held that the so-called "second look" at the agreement "is to ensure that the agreement has the same vitality at the time of the divorce that the parties intended at the time of its execution." *Id.* at 37. The agreement must be enforced unless circumstances such as the mental or physical deterioration of the contesting party, or erosion of promised support by inflation, would lead the court to conclude that the agreement was not conscionable and that its "enforcement . . . would leave the contesting spouse 'without sufficient property, maintenance, or appropriate employment to support herself.' " *Id.*, quoting 1 H.H. Clark, Jr., Domestic Relations in the United States § 1.9 (2d ed. 1987). In the *DeMatteo* case, the court rejected as insufficient the factors the judge had relied on to determine that an antenuptial agreement with "less than modest" financial provisions for the wife was invalid: lifestyle during the marriage, vast disparity in the parties' ability to acquire assets, and the fact that it was a ten-year marriage that produced two children. *Id.* at 38. The court stated that "the wife was fully apprised of the husband's holdings before she agreed to these 'less than modest' arrangements." *Id.* In fact, the court recognized that one spouse's share of the marital assets might be "disproportionately small."[10] *Id.* at 37.

Here, there has been no physical or mental deterioration of

[9]The wife was born in 1952 and has a high school education.

[10]Contrary to the suggestion of the dissent, *post* at 610, today's decision reaffirms our holding in *DeMatteo* v. *DeMatteo*, *supra*, that as a first stage inquiry, a prenuptial agreement must be found to be valid, a determination that includes, inter alia, a finding that the agreement "contains a fair and reasonable provision as measured at the time of its execution for the party contesting

the wife. She was self-supporting during a period of separation prior to their marriage. The wife has the marital home worth $1,275,000 and was awarded $525,000 in cash. She was allowed to keep many of the contents of the marital home, including jewelry acquired since the marriage worth $74,000. Given the assets she has been awarded, we cannot say that the agreement leaves the wife without sufficient property and maintenance.

*Conclusion.* For the reasons set forth above, we conclude that the agreement is enforceable and vacate the judge's order to award the wife alimony.

*So ordered.*

GREANEY, J. (dissenting, with whom Spina, J., joins). The court today denies a woman, in her fifties, with a high school education, low potential earning capacity, and a child to raise, her right to receive alimony. The linchpin of the court's decision, which pertains to the first standard stated in *Rosenberg* v. *Lipnick*, 377 Mass. 666, 672 (1979), for determining the validity of an antenuptial agreement, is the following statement:

> "The judge's findings do not permit the conclusion that the wife was 'essentially stripped of substantially all marital interests,'[1] which is the standard required to declare an agreement invalid at its execution. *DeMatteo* v. *DeMatteo*, [436 Mass. 18, 31 (2002)]."

*Ante* at 605. The court erroneously applies this standard.

As noted, the critical time frame is *the time of execution* of the agreement. *DeMatteo* v. *DeMatteo*, *supra* at 30. Significantly, at that time, the wife did not simply agree to take less than what she might have received under G. L. c. 208, § 34. Instead, she relinquished her right to both alimony and any claim on the husband's assets, essentially giving up substantially all marital

the agreement." *Id.* at 26, quoting *Rosenberg* v. *Lipnick*, 377 Mass. 666, 672 (1979).

[1]This language appeared for the first time in *DeMatteo* v. *DeMatteo*, 436 Mass. 18 (2002), which was decided after the judge had entered his decision concerning the validity of the agreement.

interests. Contrast *DeMatteo* v. *DeMatteo, supra* at 22, 34 (explaining that, although it gave wife less than she would have received under G. L. c. 208, § 34, antenuptial agreement did not strip wife of her marital rights because it provided her, at the time of its execution, with a mortgage-free house, an automobile, medical insurance, and lifetime alimony). While the agreement did not impair the wife's right to seek her share of the marital assets in the event of divorce, there were *no* marital assets at the time she executed the agreement. The wife, in substance, was given nothing under the agreement. The agreement contemplated only potential marital assets that might be acquired after marriage. Further, although the agreement contemplated the possibility of a future marital residence, it had a provision relating to circumstances where the parties lived together "in a residence owned by only one of them," and as noted by the Appeals Court, "there is . . . nothing in the agreement *requiring* [the husband] to provide a home for [the wife]" (emphasis added). *Austin* v. *Austin*, 62 Mass. App. Ct. 719, 720 n.2 (2004). Contrary to the court's statement, if no jointly owned marital home existed at the time of the divorce, the agreement required the husband only to "assist" the wife "in her relocation and support," with absolutely no monetary obligation specified or required. Thus, at the relevant time, namely, when the agreement was executed, the wife essentially gave up all her marital rights.

The parties did subsequently acquire assets during the marriage, and the wife ultimately received a share of the assets. Consideration of that fact, however, is appropriate if it becomes necessary to take a "second look" at the agreement, a step required only after it has been determined (at the time of the first look) that an agreement is valid. *DeMatteo* v. *DeMatteo, supra* at 34. There is no need to reach that consideration in these circumstances. The Appeals Court, in a well-crafted opinion, saw the flaw in the husband's arguments and voided the agreement in first-stage examination for the reasons I have described. See *Austin* v. *Austin, supra* at 727 ("In so doing [namely, concluding that this agreement should not be enforced], we do not consider the circumstances at the time of the divorce, including whether either party has accumulated additional assets

since the agreement was made. That inquiry occurs during the 'second look' stage, when a court deciding whether and to what extent to enforce a valid term of the agreement must assess if it is 'conscionable' to do so. *DeMatteo* v. *DeMatteo*, 436 Mass. at 38''). Thus, the court has analytically transposed the proper order that governs examination of the validity of antenuptial agreements. In so doing, it has implicitly overruled portions of the *DeMatteo* decision that hew closely to the traditional two-stage analysis, holding, without expressly saying so, that an agreement, perhaps proper at the second look, is valid for all purposes, even if it is nugatory at the time of execution.

For these reasons, I respectfully dissent.