NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

24-P-930

SAMUEL FORMAN

vs.

YULIKA E. FORMAN.

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

Following a trial that proceeded in multiple stages, a judge of the Probate and Family Court concluded that an antenuptial agreement (agreement) executed by Yulika E. Forman (wife) and Samuel Forman (husband) was fair and reasonable when it was signed and that, despite the husband's substantial breaches of his obligations under the agreement, it was enforceable at the time of the divorce.[1]  After the second phase of the trial, the judge ordered a division of assets pursuant to the agreement and a Memorandum of Understanding for Partial Judgment (MOU) submitted by the parties in which they agreed to

_____

[1] A partial judgment reflecting that conclusion entered on May 4, 2023.

the disposition of the marital home and certain child-related expenses.[2]  Thereafter, a final judgment of divorce nisi was entered by a different judge.[3]  On appeal, the wife argues, among other things, that the agreement was rendered unenforceable due to the husband's breaches and therefore the judge should have fashioned an appropriate equitable remedy, including alimony, in accordance with G. L. c. 208, §§ 34, 48-55.  For the reasons discussed below, we discern no error or abuse of discretion and affirm the judgment.

Background.  The parties were married on October 10, 2004. At that time, the wife was thirty-four years old, and the husband was fifty-one years old.  This was the wife's first marriage and the husband's second marriage.[4]  The husband had significantly more assets than the wife and proposed that the two execute an agreement to protect those assets in the event

---

[2] The MOU was incorporated into a second partial judgment reflecting the division of assets entered on July 27, 2023.

[3] The final divorce judgment entered on June 10, 2024.  The final judgment incorporated a third partial judgment relating to a child-related issue, which is not challenged on appeal.

[4] Three children were born of the marriage, twins, who were sixteen years old at the time of the divorce, and one younger child, who was thirteen.

the parties divorced.[5] The wife agreed to do so, and the parties' wedding was postponed while the terms of the agreement were negotiated. Both parties were represented by counsel and after exchanging several drafts, some of which included changes favorable to the wife, the parties finalized the agreement and signed it about a week before they were married. As relevant here, the agreement provides that in the event of divorce (1) neither party shall receive alimony; (2) the parties shall retain their separate property; and (3) any jointly held property shall be divided equally. The agreement further provided that (1) the husband shall make contributions to a joint account (contribution account) of $6,000 per month during the first twenty years of the marriage;[6] (2) the contribution account shall constitute joint property for purposes of property division; and (3) upon divorce, the wife shall receive the greater of (a) fifty percent of the contribution account balance (including market gains/losses), or (b) the amount set forth in a table attached to the agreement as the minimum payment due to the wife based on the duration of the parties' marriage. At the

---

[5] At the time the agreement was executed, the husband had assets totaling approximately $15 million and the wife had assets totaling less than $50,000.

[6] The contribution account was established as an investment account at Charles Schwab and is sometimes referred to by the parties and the judge as "the Schwab 8934 account."

time of the divorce the parties had been married for fifteen years and the minimum payment specified by the table for a marriage of that duration was $820,000.[7]  The contribution account was not to be used as an operational account and required both parties' written consent for the funds to be withdrawn.

The husband filed a complaint for divorce in November 2018, which was amended in April 2019.  The amended complaint alleged an irretrievable breakdown and requested an equitable division of assets pursuant to the parties' prenuptial agreement.  The wife filed an answer and counterclaim in which she sought an equitable division of the marital estate pursuant to G. L. c. 208, § 34.

At the time of trial, the husband, who is a physician, was providing consulting services as an expert in tort litigation through his consulting business.  The wife, who has a Ph.D. in child development from Tufts University, was operating a sole proprietorship, which provides consulting services to parents of children with disabilities.  She also had assumed primary responsibility for the children throughout the marriage and at the time of the trial.

---

[7] See Section II(B)(3)(b) of the agreement.

4

The validity of the agreement at the time it was signed and at the time of the divorce were contested issues at trial. As previously noted, the judge determined that the agreement was fair and reasonable at the time of its execution, was conscionable at the time of the divorce, and therefore was enforceable. In reaching her conclusion that the agreement was enforceable, the judge noted that, "[i]n total, the Wife will likely leave the marriage with at least $3 million in assets." The judge acknowledged that this amount is likely less than the wife may have received under G. L. c. 208, § 34, but concluded that because the amount the wife will receive under the agreement "will enable her to have sufficient property to support herself," she "has not been stripped of substantially all of her marital interests." The judge also noted that the agreement provided for specific performance in the event of a breach by either party during the course of the marriage. The judge found that both the husband and wife had breached the agreement by making unauthorized withdrawals from the contribution account: the husband made several withdrawals totaling $283,148 whereas the wife made a single withdrawal in the amount of $7,983. In addition, the husband failed to make

5

many of the required $6,000 monthly deposits to the account.[8] There being insufficient evidence to determine the number of missed payments presented at the first phase of the trial, the judge requested additional evidence to be presented at the second phase of the trial so that "specific performance of the [agreement] can be effectuated." Citing to Austin v. Austin, 445 Mass. 601, 605 n.7 (2005), the judge made clear that she had the authority to fashion an equitable remedy "regardless of whether the agreement itself was valid either at its execution or at the time of the divorce" and that she would "determine the most equitable remedy to the above-referenced breaches following the second portion of the bifurcated trial."

Thereafter, following the second phase of the trial, the judge again concluded the agreement was enforceable even though the husband had materially and substantially breached the agreement by (1) failing to make all the required $6,000 monthly deposits to the contribution account, and (2) making numerous unauthorized withdrawals from the account. The judge found that, had the husband not breached his obligations under the agreement, the value of the contribution account in 2020 would have been $1,564,313. In so finding, the judge relied on the

---

[8] At trial, the husband acknowledged that he stopped making the deposits beginning in 2011.

6

opinion offered by the husband's financial expert and rejected the opinion of the wife's financial expert, who had opined that the balance would have been $2,163,810.[9] The judge then awarded the wife $820,000 as per the agreement because that amount was greater than one-half of the contribution account's hypothetical value according to the husband's expert.[10] As set forth in the MOU, the wife also received one-half of the value of the marital home, which was valued at approximately $4 million. In accordance with the terms of the agreement, the wife was not awarded alimony. In regard to the husband's breaches of the agreement, the judge ruled that because the breaches did not ultimately result in any change in the amount due to the wife, the "appropriate and fair remedy" was to effectuate the terms of the agreement.

Discussion. "For an antenuptial agreement to be enforceable, it must be both (1) fair and reasonable at the time of execution (the 'first look'), and (2) conscionable at the time of enforcement (the 'second look')." Rudnick v. Rudnick,

---

[9] The experts also offered opinions as to what the account balance would have been in 2023, if the funds had remained in the account and continued to appreciate in their existing investment allocation: $1,993,330 (per the husband's expert), and $3,802,499 (per the wife's expert).

[10] The sum was reduced to $715,000 to account for an advance distribution to the wife during the pendency of the divorce.

102 Mass. App. Ct. 467, 470 (2023).  The wife does not challenge the judge's conclusion that the agreement was fair and reasonable at the time it was signed.[11]  She contends that the judge abused her discretion in determining that the agreement was enforceable at the time of the divorce given that the judge found the husband had consistently breached his obligations under the agreement.  According to the wife, because the agreement was unconscionable upon a "second look" at the time of divorce, she was entitled to an equitable division of all marital assets pursuant to G. L. c. 208, § 34, and alimony under §§ 48-55.  See Rudnick, supra.

As the wife correctly contends, where an agreement is valid at the time of execution, a judge must still take a so-called second look at its provisions at the time it is enforced to ensure that "the agreement has the same vitality at the time of the divorce that the parties intended at the time of execution." DeMatteo v. DeMatteo, 436 Mass. 18, 37 (2002), citing MacFarlane v. Rich, 132 N.H. 608, 616-617 (1989).  After the second look, the agreement must be enforced

> "unless circumstances such as the mental or physical
> deterioration of the contesting party, or erosion of
> promised support by inflation, would lead the court to
> conclude that the agreement was not conscionable and that
> its 'enforcement . . . would leave the contesting spouse

_____

[11] At oral argument, the wife made clear she was challenging the agreement's conscionability at the time of enforcement.

8

without sufficient property, maintenance, or appropriate
employment to support herself."

Austin, 445 Mass. at 607, quoting DeMatteo, 436 Mass. at 37.

Here there was no evidence of any physical or mental deterioration of the wife or any significant change in circumstances such that enforcement of the agreement would leave the wife unable to support herself. On the contrary, the wife was in good health and although she was not earning an amount equal (or even close) to the husband at the time of the divorce, she was operating her own consulting company. In addition, given that the wife will receive approximately $2 million from her share of the marital home, additional personal property, and the sum of $820,000, the judge properly concluded that the wife will leave the marriage with sufficient assets (approximately $3 million) to support herself. While we acknowledge that the wife's assets upon the divorce are far less than the husband's, this disparity has no bearing on the question of conscionability. As the court noted in DeMatteo, a valid antenuptial agreement will not be rendered unenforceable "merely because its enforcement results in property division or an award of support that a judge might not order under G. L. c. 208, § 34, or because it is one sided." DeMatteo, 436 Mass. at 36. Thus, while the wife's displeasure with the result is

9

understandable, the judge did not err in concluding that the agreement is enforceable.

Nor did the judge err by concluding that the husband's numerous breaches of the agreement did not render it unconscionable. To begin with, we note that the judge fully recognized that she had the authority to depart from the agreement due to the parties' breaches in connection with their treatment of the contribution account. As the judge explained, again quoting from Austin, 445 Mass at 605 n.7, "where a party breaches an antenuptial agreement, 'the judge [has] the equitable power to design a remedy, such as adjusting the distribution of assets, regardless of whether the agreement itself was valid either at its execution or at the time of the divorce.'" The judge considered and rejected the wife's argument that the husband's breaches were so egregious so as to require her to ignore the terms of the agreement. As discussed, the judge concluded that the husband's unauthorized withdrawals from the contribution account and his failure to make the required monthly deposits into the account were inconsequential because, had those breaches not occurred, fifty percent of the value of the "recreated" account did not exceed the minimum ($820,000) owed to the wife in the event of a divorce after fifteen years of marriage. The judge explained there was no

10

reason to fashion an equitable remedy instead of effectuating the terms of the agreement because, "ultimately," the breaches "did not result in [the wife's] portion of the recreated [contribution account] balance exceeding $820,000 . . . . [and, as a result,] the appropriate and fair remedy for the parties' breaches of the [agreement] is accomplished by effectuating" the terms of the agreement.

Rudnick, 102 Mass. App. Ct. at 470-473, and Kelcourse v. Kelcourse, 87 Mass. App. Ct. 33, 35-36 (2015), two cases on which the wife relies, do not compel a different result.  In Rudnick, the husband's breaches of the antenuptial agreement effectively stripped the wife, who was eighty-six years old at the time of the divorce and unable to earn income, of substantially all marital assets.  Rudnick, supra at 470-473. In Kelcourse, the antenuptial agreement was deemed unconscionable where the wife was left with negative assets due to a significant drop in the value of the marital home. Kelcourse, supra at 35-36.  Here, by contrast, the husband's breaches did not result in leaving the wife without sufficient assets to support herself.

The wife's remaining arguments require little discussion. Contrary to the wife's assertion, the judge's ruling regarding the hypothetical balance of the contribution account was not

11

based on speculation.  Rather, it was based on the calculations

provided by the husband's expert which the judge found to be

"sound and credible."  The judge was entitled to credit the

analysis of the husband's expert and reject that of the wife's

expert, which she found to be "unhelpful."[12]  See Bernier v.

Bernier, 449 Mass. 774, 785 (2007), quoting Fechtor v. Fechtor,

26 Mass. App. Ct. 859, 863 (1989) ("When the opinions of

valuation experts differ, a judge may 'accept one reasonable

opinion and reject the other'").

Lastly, the wife asserts that the judge erroneously

determined that the proper valuation date for the contribution

account was the date of the termination of the marriage, April

2, 2020, rather than the date of the actual divorce in 2023.  In

support of this assertion, the wife relies on Obara v.

---

[12] More specifically, the judge found the husband's expert "completed a logical recreation of what the Schwab 8934 account balance would be as of March 31, 2020 with the proper deposits and without the improper withdrawals by applying Husband's actual investment allocation over time since 2004."  "This investment strategy included only an allocation of an average of only approximately 17% into S&P 500 funds."  The judge further said:
> "[O]n the other hand, [the wife's expert] assumed in his recreation of the Schwab 8934 account that all of the funds in the account would be invested in the S&P 500.  This simply was not the investment allocation Husband chose, nor was Husband required under the Antenuptial Agreement to choose to invest all the funds in the S&P 500.  It is therefore not a reasonable assumption in determining what the account balance would have been as of 2020."

12

Ghoreishi, 103 Mass. App. Ct. 549, 552 (2023), a case in which we held that property subject to equitable division under G. L. c. 208, § 34, is typically valued as of date of division, i.e., time of trial. However, this case involves enforcement of an antenuptial agreement and not an equitable division of property under G. L. c. 208, § 34. Here, once the judge determined that the agreement was enforceable and that specific performance of its terms was appropriate, she did not err in choosing the valuation date specified in the agreement. At that point, the terms of the agreement were controlling and, as defined in the agreement, joint marital assets were to be valued "at the time of the Termination" of the marriage. The judge properly concluded that she had no discretion to deviate from the date set forth in the agreement, which she described as "clear and unambiguous." See Korff v. Korff, 64 Mass. App. Ct. 94, 94 (2005) ("Once it was determined that an antenuptial agreement was valid, it was improper for the Probate and Family Court

judge to alter its alimony provisions").

Judgment affirmed.

By the Court (Vuono, Shin &
Smyth, JJ.[13]),

Clerk

Entered:  March 17, 2026.

---

[13] The panelists are listed in order of seniority.