AMANOLLAH HOMAYOUN VAKIL *vs.* GUITI ADJAMI VAKIL.

No. 04-P-1121.

Hampden. June 8, 2005. - June 15, 2006.

Present: PERRETTA, DREBEN, & GELINAS, JJ.

Further appellate review granted, 447 Mass. 1111 (2006).

*Divorce and Separation,* Alimony, Amendment of pleadings. *Husband and Wife,* Antenuptial agreement. *Contract,* Antenuptial agreement.

Provisions contained in an antenuptial agreement waiving the husband's alimony obligations to the wife were neither in conflict nor ambiguous, and were not unenforceable on public policy grounds [536-537]; however, a probate judge erred in denying the wife's requests to amend her answer to the husband's complaint and to be relieved of a stipulation providing that the agreement be given full force and effect, where there was nothing in the record to suggest that the wife was acting in bad faith, with a dilatory motive, or to the surprise and prejudice of her husband, and where the record reflected the husband's superior economic status and at least some information in support of the wife's claim of duress in signing the agreement due to the husband's abusive treatment of her throughout their two marriages [537-540]; therefore, this court remanded the matter to the Probate and Family Court for further proceedings, including consideration of the validity and enforceability of the agreement [540].

COMPLAINT for divorce filed in the Hampden Division of the Probate and Family Court Department on August 29, 2002.

The case was heard by *David G. Sacks,* J.

*Andrew M. Porter* for Guiti Adjami Vakil.

*Mark T. Smith* for Amanollah Homayoun Vakil.

PERRETTA, J. On the day before their remarriage, Guiti Adjami Vakil (wife) and Amanollah Homayoun Vakil (husband) entered into an antenuptial agreement (agreement). About six years later, the husband sought a divorce and enforcement of the agreement. Based on the terms of the agreement, the wife's answer to the husband's complaint for divorce, and a stipulation subsequently entered into by the wife providing that the agreement "shall be given full force and effect," the judge enforced

the terms of the agreement without first making any determination as to whether it was valid and enforceable in accordance with those procedures discussed in *DeMatteo* v. *DeMatteo*, 436 Mass. 18, 26-31 (2002), and, most recently, *Austin* v. *Austin*, 445 Mass. 601, 603-604 (2005), and cases therein cited.[1] Concluding that the judge was in error in denying the wife's requests to amend her answer and to be relieved of the stipulation and instead holding her to the terms of the agreement, we reverse paragraphs 1-12 of the judgment and the orders denying the wife's motion to amend her answer and to be relieved of her stipulation, and remand the matter to the Probate Court for proceedings consistent with this opinion.

1. *The history of the marital relationship.* The wife and the husband were first wed in Iran in May, 1983,[2] and have a son who was born on March 21, 1986. Their first marriage ended in a divorce granted by a judge of the Probate Court in 1993. According to the terms of their separation agreement, dated March 19, 1993, which was incorporated into and survived the 1993 divorce judgment, the husband was to pay the wife monthly alimony in the amount of $1,800, until the death of either of them or her remarriage, as well as $3,200 per month in child support; transfer to the wife his title to an apartment located in Tehran, Iran; and assume a $10,000 debt that the wife had incurred for purposes of her education.

Notwithstanding their 1993 divorce, the husband and wife continued to live together until their remarriage on August 8, 1996.[3] The day before their remarriage on August 8, 1996, the parties signed the agreement in issue. The pertinent clauses of the agreement provide that in the event of a divorce, each party would retain all presently held and after-acquired property owned in their individual names, including but not limited to

[1]At oral argument, we agreed to delay our decision in this matter in order to await the outcome of *Austin* v. *Austin*, *supra*.

[2]It appears from the materials in the record appendix that the parties had entered into a six-month "temporary marriage" prior to their 1983 "formal marriage" in Iran. At that time, each had one child from previous marriages.

[3]The wife testified in the present action that she and the husband had deliberately concealed from the judge during the pretrial proceedings in this matter that she and the husband had continued to live together after their 1993 divorce.

retirement benefits. Jointly owned assets would be divided equally.

The agreement also provided that upon the filing of a divorce complaint by either the husband or the wife, the party who did not own the marital home would vacate it forthwith. At that time and irrespective of who would be required to vacate the residence, the husband would pay the wife $25,000. The husband also agreed to name and maintain the wife, regardless of their marital status, as one of three cobeneficiaries on a life insurance policy in the amount of $500,000, and to pay her student loan. Article III(B)(2)(a) of the agreement provides:

> "[The wife] shall not at any time make any claim or demand upon [the husband's] estate for periodic alimony, spousal support, or separate maintenance or demand to be supported by [the husband] in any manner or upon any condition if she contests directly or indirectly the granting of a divorce to [him]."

The agreement also recites that the parties' financial statements were attached and made a part of the agreement and that each was afforded but waived the opportunity to investigate or to discover the other's financial circumstances prior to signing the agreement.[4]

On May 11, 2002, the husband was ordered to vacate the marital residence pursuant to G. L. c. 209A.[5] The wife then filed a complaint for separate support, and the husband was ordered to pay her $600 per week in child support, all uninsured medical and dental expenses incurred on behalf of her and their son, and the outstanding mortgage and equity loan on the marital residence.

---

[4]As best we understand the arguments of the wife's counsel and the testimony of the wife at trial, the husband had not provided her with any information concerning his assets prior to the signing of the agreement.

[5]The events that resulted in the vacate order were also the basis for criminal charges against the husband, specifically, assault by means of a dangerous weapon and threatening to commit a crime. He was acquitted of the former and convicted of the latter. The vacate order was periodically extended and in effect until September 5, 2003, when during the trial in the present action, the judge ordered the wife to leave the premises and the husband to pay her $6,000 in moving expenses.

2. *The history of the litigation.* On August 29, 2002, just weeks after being ordered to vacate the marital residence, the husband filed a complaint for divorce pursuant to G. L. c. 208, § 1B, and asked that the terms of the agreement be enforced. In her answer to the complaint, filed on November 18, 2002, the wife denied that the marriage was irretrievably broken and asked that in the event the husband be granted a divorce, the agreement be declared invalid and unenforceable; she be awarded custody of their son, child and spousal support, and medical and life insurance; and the marital home be conveyed to her. She also requested an award of attorney's fees incurred in defending against the husband's complaint for divorce.

There the matter stood until February 4, 2003, when a judge other than the trial judge ordered that trial on the husband's complaint be bifurcated and that the issues of the validity and enforceability of the agreement first be determined. However, on April 2, 2003, before any evidentiary proceeding could be conducted pursuant to the bifurcation order, the parties entered into a written stipulation that provided that "[t]he parties agree that the Antenuptial Agreement between the parties . . . shall be given full force and effect [and] [t]he [wife's] application for alimony shall be scheduled for trial."

At a pretrial conference conducted five days later on April 7, 2003, the wife's attorney represented to the judge that the wife had withdrawn her challenge to the validity of the agreement. Following that conference, the judge entered a "pre-trial order," dated April 11, 2003, that provided that the issues to be taken up at trial, as here pertinent, were the division of certain Persian rugs, the "amount of periodic alimony," and the amount of attorney's fees payable to the wife's attorney on the wife's complaints for contempt arising out of the husband's failure to comply with existing support orders pending action on his complaint for divorce, and that discovery was to be completed on or before June 6, 2003. The order also noted that the parties had agreed that their son would reside with the husband and that the wife had "withdrawn her challenge to the validity of the antenuptial agreement."[6]

Trial on the husband's divorce complaint began on August 18

---

[6]This order was amended on June 10, 2003, to include the division of

and concluded on September 15, 2003. During that time, the wife's attorney made oral and written motions seeking to amend the wife's answer of November 18, 2002, and vacate her stipulation of April 2, 2003. On the first day of trial, the wife's attorney made an oral motion to vacate the stipulation of April 2, thereby effectively asking the judge to determine whether the agreement was valid and enforceable. Counsel for the wife informed the judge that the wife intended to show that she had signed the agreement "under duress."[7] The judge perceived the wife's oral motion as an untimely raising of a new issue. It is not at all clear from the record before us whether, at that time (August 18), the judge specifically denied the wife's request or merely indicated his inclination to do so.

In any event, cross-examination of the husband on the first day of trial included questions concerning the grounds for divorce as well as questions relevant to the issue of alimony. The questions relevant to alimony prompted a colloquy between the judge and counsel for the wife regarding the interpretation and effect of the alimony waiver set out in the agreement. More specifically, the parties disputed whether that provision precluded the wife from seeking alimony because she was contesting the granting of the divorce and, if so, whether she

---

certain antiques as an issue to be resolved at trial.

[7]There is some support in the record for the wife's claim of duress. In an affidavit signed by the wife under pains and penalties of perjury on January 9, 2003, and filed in her action for separate support, she averred that the husband had coerced her into signing the agreement by threatening to take their son to Iran and prevent her from ever again seeing him and that he had obtained an Iranian passport for the son just a few months before she signed the agreement. In her proposed findings of fact, filed in the present action on September 22, 2003, the wife requested that the judge find that "[d]uring a temporary hearing where custody of [the parties' son] came as an issue . . . [the wife], in desperation, exclaimed that she accepted the prenuptial agreement under the assumption that if she did not contest the divorce at that time, that all provisions of the [a]ntenuptial [a]greement would be valid and she would regain custody of her son." Article III(A)(6)(a) does provide that upon a divorce the parties would have shared legal custody of their son and that the wife would have sole physical custody subject to the husband's right to visitation. The judge remarked during trial that he was "satisfied at the time that [he] heard [the wife at the pretrial conference]" on the matter of her stipulation that she did not appear to be under any immediate distress and that she had "good counsel." However, the judge stated in his decision that the husband "had a pattern of being abusive to the wife over the years."

had triggered the alimony waiver clause. The wife's argument, read generously, was that the alimony provisions of the agreement did not preclude her from contesting the divorce and seeking alimony and that, in any event, she "revoke[d] her answer . . . accept[ed] the terms of the prenuptial agreement" and, consequently, did not waive her right to seek alimony.

At no time during this colloquy did the wife clearly and affirmatively represent that she was not contesting the divorce. When the judge asked whether the wife had amended her answer to the husband's complaint, he was informed that she had not. The judge then declined to make an immediate ruling on the interpretation to be given the provisions of the agreement relating to alimony, and he permitted the wife some cross-examination of the husband concerning his income and expenses. At the end of the day, the judge indicated that he would likely rule that the wife had waived her right to alimony by contesting the divorce.

No testimony was taken the next day, August 19. Instead, the wife filed a written motion to amend her answer to the divorce complaint to reflect that she did not contest the divorce so that the pleadings would "comport with the statements made by her at the evidentiary hearing relative to the validity of the antenuptial agreement." We find nothing in the record to show that an evidentiary hearing concerning the validity of the agreement was in fact ever held.[8]

The endorsement on the August 19 motion to amend reflects that it was denied on September 5, 2003. It appears that the wife's counsel was aware of the denial of her motion to amend at the time she resumed her cross-examination of the husband on September 5. Moreover, the judge made clear to the wife's counsel during cross-examination of the husband on that date that no questions pertinent to the issue of alimony were to be put to the husband. As stated by the judge during the proceedings on September 5, "[t]here's no alimony issue in this trial." In making this statement, the judge made reference to a ruling he believed he had made on the first day of trial. We are again unable to find in the record before us any ruling made on August 18 or on

---

[8] However, as we earlier noted, the stipulation of April 2 expressly reserved alimony as an issue to be scheduled for trial.

any other day prior to September 5, on the wife's request to be relieved of the stipulation or to amend her answer to the defendant's complaint. Nor does the record before us reflect that counsel for the wife, on August 18, August 19, or September 5, clearly informed the judge that the wife did not wish to contest the divorce or remind him of the terms of the stipulation or the pretrial order. Rather, on August 18, the wife's counsel seemed to acknowledge tacitly that the wife had rejected her advice to refrain from contesting the dissolution of the marriage, and she conducted a brief cross-examination of the husband on his claim of an irretrievable breakdown of the marriage.

3. *The judge's decisions.* On October 7, 2003, the judge issued a summary of decision and a judgment of divorce nisi.[9] After the wife filed a notice of appeal, the judge issued written findings of fact on the factors set out in G. L. c. 208, § 34. See Mass.R.Dom.Rel.P. 52(a).

a. *The summary of decision.* In his summary of decision, the judge set out the bases for his rulings on the wife's motions to amend her answer and to vacate her stipulation. He concluded that justice did not require the granting of the motion to amend where considerable time had passed since the wife filed her answer and trial was "substantially underway and a mistrial would be required as a cleansing of the record would require re-exam/presentation of [the husband's] case." He explained that to allow the wife's motion to amend her answer would be contrary to judicial economy but could be done if necessary to prevent a miscarriage of justice. However, as determined by the judge, "[a] miscarriage of justice . . . is not present in this case. There is much to be said for accountability and responsibility for one's decisions, particularly when weighty decisions which impact on the course of litigation are made, as here, with the on-going advice of an attorney."

As for his refusal to allow the wife to vacate her stipulation and challenge the agreement, the judge acknowledged the

---

[9]On that same day, October 7, 2003, the judge also adjudicated the husband guilty of contempt for his failure to comply with two court orders pertaining to the payment of counsel fees incurred by the wife in her attempts to enforce temporary support orders. The husband did not file a notice of appeal from those judgments, which order that he pay the wife's counsel $17,441.20.

seriousness of upholding the waiver of alimony based on the wife's contesting the divorce but concluded that "[t]he only hardship suffered by enforcing the parties' agreement . . . is that of the consequences of their bargain."

b. *The judgment.* The judgment provides that the "terms of the parties' antenuptial agreement control the distribution of the marital estate." Consequently, paragraph 2 of the judgment provides "[t]hat no alimony is ordered." The husband was to retain eighteen "missing" or "disputed" Persian rugs while the wife was to retain three rugs in her possession and to receive one-third of any insurance proceeds paid to the husband by reason of any claim that he might file concerning the "missing" rugs. This part of the judgment, paragraphs 3 and 4, appears to be based on the judge's determination, as set out in his summary of decision, that the wife was more credible than the husband on the matter of the Persian rugs.[10] Although the agreement is silent about any obligation on the husband's part to maintain medical insurance for the wife, the judgment requires him to do so, provided that his insurer allows him to do so without any additional cost; if there is any such additional cost, it is to be paid by the wife should she wish coverage under the husband's policy.

The judgment is silent, however, on those provisions of the agreement concerning the husband's obligations to maintain the wife as one of three cobeneficiaries on a $500,000 life insurance policy; to assume responsibility for her student loan; and to pay her $25,000 should she be required, as she was, to vacate the marital home.[11]

c. *The findings.* After the wife filed her notice of appeal from the judgment, the judge made findings of fact pursuant to Mass. R.Dom.Rel.P. 52(a) on the various relevant factors set out in

---

[10]We assume that the division of the rugs was based on that article in the agreement that provides that "[a]ll assets currently in the name of each party wherever located shall remain the sole and exclusive property of that person." Although there was dispute between the parties as to the ownership of various antiques, the judge declined to make any award because of insufficient evidence concerning "their present whereabouts and value."

[11]The judge did note in his summary of decision that he had ordered the wife to vacate the marital residence on September 5, 2003, and the husband to pay her $6,000 in moving expenses.

G. L. c. 208, § 34. We relate those findings pertinent to the issues raised on appeal.

At the time of trial, the husband was fifty-eight years of age and a practicing anesthesiologist earning a gross weekly income of $4,512, or $234,000 a year. The wife was fifty-five and a teacher at a parochial high school on a year-to-year contract basis. She had a gross weekly salary of $549.06, or about $28,500 a year. The judge described the level of the husband's income as "upper class level" and the wife's as "middle to lower middle class." During the marriage, the husband's income "provided the marital home and related expenses" while the wife's income "provided for the majority of her own expenses and for those of their son." The judge also found that notwithstanding potentially serious medical conditions, the parties were in good health at the time of the divorce and capable of maintaining their employment.[12] Continued employment will provide the husband and the wife with respective gross annual salaries of $234,000 and $28,548.

Although the judge found that neither party "expects to receive any inheritances," the husband's father, a deceased "physician [who] was in the government" had assets that are "tied by the Islamic regime in Iran." His mother passed away in 2002 and her estate had yet to be finalized.

Presumably because the agreement states that "[a]ll assets currently in the name of each party wherever located shall remain the sole and exclusive property of that person," the judge made no findings with respect to the nature or value of the parties' individual assets. However, their financial statements, dated about seven months prior to trial, have been included in the record appendix. The wife's statement was signed and dated January 15, 2003. The husband's statement was dated August 15, 2003, but was unsigned.

Our review of those statements shows that the wife had an individual retirement account and other retirement accounts valued at about $45,600, jewelry worth about $5,000, household

---

[12]The husband has diabetes and is in remission from leukemia for which, unbeknownst to the wife, he had been treated five years prior to the instant proceedings. The wife has a benign liver cyst for which she undergoes an annual screening.

possessions valued at $22,500, and a car which she estimated to be worth about $7,000. According to the wife, her retirement accounts were funded by money she had received from the sale of an apartment in Iran owned by the husband and transferred to her at the time of their first divorce. Title to the marital home was held in the husband's name. According to his unsigned financial statement of August 15, 2003, the property was purchased in 2000 for $425,000 and, as of 2003, had an assessed value of $457,000, and a fair market value of $480,000. It was encumbered by a first and second mortgage in the total amount of $411,000. He possessed two motor vehicles and had retirement and profit-sharing plans with a 2003 current balance or value of approximately $69,000.[13] Although the husband and wife maintained a middle to upper class lifestyle during their marriage, at the time of the divorce, the husband's debt amounted to $288,500,[14] and the wife's liabilities, exclusive of attorney's fees, were in the approximate amount of $17,483.60.[15]

4. *The issues.* The wife makes numerous arguments concerning the validity and enforceability of the agreement as it pertains to alimony. She also presents an alternative argument, that is, assuming the agreement to be valid and enforceable, the judge erred in failing to enforce that provision of the agreement

[13]In an unsigned affidavit dated February 4, 2003, the husband assigned a current balance or value of $49,690 to his retirement and profit-sharing plans.

[14]As found by the judge, apparently in reliance on the husband's unsigned financial statement, the husband's liabilities are "seven . . . credit cards on which he has incurred debt from 1993 to the present date; 2001 and 2002 state and federal tax liabilities . . . and . . . the wife's student loan which he agreed to pay under the terms of the Antenuptial Agreement. [The husband] has a facility for opening multiple credit card accounts in his name or another family member's name and then juggling the several charge cards to keep his finances afloat." The amount of the husband's debt appears to include the amount of payments on a first and second mortgage on the marital residence, title to which is held in his name, as well as State and Federal tax liabilities. We could find nothing in the record before us to indicate whether the wife also has joint liability on the overdue tax payments listed by the husband in his financial statements. Also, and according to the husband's unsigned financial statements, the former marital residence was encumbered by mortgage debt in the amount of $411,000, and had a fair market value of $480,000.

[15]As described by the judge and as listed in the wife's signed financial statement, this amount is comprised of "personal loans [$11,000], a medical bill for $817.60, and a $1,416.00 school loan."

entitling her to an award of $25,000 upon her vacating the marital residence.

5. *Discussion.* We quickly dispose of several of the wife's arguments. First, we see no conflict or ambiguity in the two provisions of the agreement pertaining to alimony. As earlier recited, Article III(B)(2)(a) provides that should the wife contest a divorce from the husband, she would forfeit her right to alimony. However, an earlier provision in the agreement, Article III(A)(6)(d), reads:

> "Nothing herein shall be construed as to prevent [the wife] from seeking an award of periodic alimony at the time of a divorce if she is then eligible for such an award of alimony."

We read the two articles as a harmonious whole in respect to the issue of alimony and conclude that Article III(B)(2)(a) modifies the earlier Article III(A)(6)(d). Cf. *J.A. Sullivan Corp.* v. *Commonwealth*, 397 Mass. 789, 795 (1986); *Jacobs* v. *United States Fid. & Guar. Co.*, 417 Mass. 75, 77 (1994). When read together, they provide that the wife would not be "eligible" to receive an award of alimony if she chose to contest the husband's request for a divorce.

The wife's claim that the alimony waiver clause, Article III(B)(2)(a), is unenforceable on public policy grounds, was most recently rejected in *Austin* v. *Austin*, 445 Mass. at 603-604 ("[a]ntenuptial agreements that waive alimony are not 'per se against public policy and may be specifically enforced.' *Osborne* v. *Osborne*, 384 Mass. 591, 598 [1981]").[16] Rather, antenuptial agreements are subject to the demanding two-part scrutiny most recently discussed in *Austin* v. *Austin*, 445 Mass. at 603-604, and cases therein cited; that is, the agreement must be found to be valid at the time of its execution and fair and reasonable at the time of the divorce.

---

[16]The wife's reliance on *A-Z Servicenter, Inc.* v. *Segall*, 334 Mass. 672, 675 (1956), for the proposition that the alimony waiver clause is a disfavored "penalty clause," is misplaced. *Segall* involved a commercial transaction and holds that whether a term of an agreement constitutes a penalty depends on the nature of the agreement and its accompanying circumstances. However, as stated in *DeMatteo* v. *DeMatteo*, 436 Mass. at 33, "[a]ntenuptial agreements by their nature concern confidential relationships, and a standard for testing the validity of a business agreement seems to us inappropriate in this context."

Those claims aside, the real issues before us are whether the judge erred in denying the wife's motions to amend her answer and to be relieved of her stipulation which provided that the agreement "shall be given full force and effect." Those rulings left the agreement in place and led the judge to deem it unnecessary to conduct the two-part analysis set out in *DeMatteo* v. *DeMatteo*, 436 Mass. at 26, and applied to the antenuptial agreement at issue in *Austin* v. *Austin, supra.*

Based on the law as applied to the facts appearing in the appellate record, we conclude that it was error for the judge to deny the wife's motion to amend her answer and her motion to withdraw her stipulation. See *Commonwealth* v. *Carter*, 423 Mass. 506, 510 (1996) ("Virtually all decisions that a trial judge must make, even when the judge has discretion as to the precise result, are decisions of law"), also cited in *Long* v. *Wickett*, 50 Mass. App. Ct. 380, 386 n.8 (2000). We need not repeat the judge's reasons for denying the motions. They are set out at length in part 3.a of this opinion, *supra.*

In reviewing the denial of the wife's motion to amend her answer, we look to *Sharon* v. *Newton*, 437 Mass. 99, 102 (2002). There the court stated:

> "While we have often upheld a judge's discretion to deny leave to amend based in part on undue delay, such denials have generally been coupled with consideration of other factors such as imminence of trial and futility of the claim sought to be added. See, e.g., *Leonard* v. *Brimfield*, 423 Mass. 152, 157[, cert. denied, 519 U.S. 1028] (1996); *Mathis* v. *Massachusetts Elec. Co.*, 409 Mass. 256, 264 (1991); *Castellucci* v. *United States Fid. & Guar. Co.*, 372 Mass. 288, 292 (1977)."

The primary concern in considering the wife's request that she be relieved from her stipulation is set out in *Crittenton Hastings House of the Florence Crittenton League* v. *Board of Appeal of Boston*, 25 Mass. App. Ct. 704, 712-713 (1988):

> "Both appellate and trial courts have the power to 'vacate a stipulation made by the parties if it is deemed improvident or not conducive to justice.' *Loring* v. *Mercier*, 318 Mass. 599, 601 (1945). See, e.g., *Francesconi*

v. *Planning Bd. of Wakefield,* 345 Mass. 390, 393-394
(1963) (because the record provided too meager a basis
to permit the court to determine whether the regulation
there in question was unconstitutional in its application,
the stipulation was discharged and the matter remanded
to the trial court '[t]o permit fuller development of the
facts'); *Commonwealth* v. *Clarke,* 350 Mass. 721, 722
(1966) (stipulation set aside and matter remanded to the
trial court because of omitted facts deemed necessary to
decide the question on report); *Woods* v. *State Bd. of
Parole,* 351 Mass. 556, 560 (1967) (if party found to
have entered into stipulation 'improvidently' because
without counsel at the time, the stipulation could be
discharged as 'not conducive to justice'); . . . *Houghton*
v. *Rizzo,* 361 Mass. 635, 637 n.1 (1972) (where counsel
for the defendants made an admission during a pretrial
conference which was dispositive of the case against
them and which was inconsistent with the stipulation
entered into by all the parties, the admission was
discharged as it was 'obviously not intended'); *Huard* v.
*Forest St. Housing, Inc.,* 366 Mass. 203, 208-209 (1974)
(where an action was tried on a stipulation of facts which
omitted 'seemingly significant information' known to the
court because of earlier litigation, the stipulation was set
aside and remanded to the trial court)."

There is nothing in the record before us to suggest that in
seeking to amend her answer the wife was acting in bad faith,
with a dilatory motive, or to the surprise and prejudice of the
husband. Rather, the record and the wife's arguments on appeal
tend heavily to show that her primary concern had always been
directed to the alimony waiver provision of the agreement.
Although contesting the divorce in her answer and asking that
the husband's complaint be dismissed, she also made specific
alternative requests, two of which are of relevance: she asked
that in the event the husband were granted a divorce, the court
declare that the alimony waiver provision of the agreement was
unenforceable, and that she be awarded support.[17]

In the subsequent stipulation signed by the parties' attorneys

_____

[17]Although in her answer the wife also sought medical insurance, conveyance
of the marital residence to her, and an award of those counsel fees she might
incur in defense against the husband's complaint for divorce, she presses on ap-

as well as the pretrial orders, the issue of alimony was specifically left for trial. There was an eighteen-day hiatus between argument on the wife's motion to amend her answer (August 19) and the next scheduled trial date (September 5), during which time the husband could have conducted any discovery of the wife he thought necessary pursuant to any new time limitations set by the judge.[18] Also, the wife's signed financial statement of January 15, 2003, was available to the husband well before the time of the stipulation and the pretrial orders. Our review of the parties' financial statements appearing in the record and relied upon by the judge in making his findings, see part 3.a of this opinion, *supra*, show that the wife's claims were far from futile.

Moreover, the record before us is entirely unsatisfactory. As noted in part 2 of this opinion, *supra*, it appears that there were recorded proceedings on the matters before us which, for whatever reason, went untranscribed. Those portions of the record that we do have show confusion, at the least, about the prior orders entered in the case and the issues identified for trial.

On the other hand, the record affirmatively shows that at the time of the challenged rulings, the judge had available to him the parties' agreement, stipulation, financial statements reflecting the husband's superior economic status, and some, at the very least, information in support of the wife's claim of duress due to the husband's abusive treatment of her throughout their marriages. See note 7, *supra*. Nonetheless, the judge limited his consideration of the husband's abusive treatment of the wife to an issue not before us, that is, the custody of the parties' son.[19]

As a final matter, the judge also determined that the only hardship "suffered by enforcing the parties' agreement . . . is that of the consequences of their bargain." We cannot agree. The only party who suffers from enforcement of the agreement

---

peal only the alimony waiver provision of the agreement.

[18]As earlier set out in part 2 of this opinion, *supra*, the judge's pretrial order of April 11, 2003, provided that discovery was to be completed on or before June 6, 2003.

[19]In ordering that the husband be awarded custody of the parties' son, then about seventeen years of age, the judge stated that he did so "reluctantly" and that his reluctance was due to the fact that the husband, because of his "history of being controlling and abusive towards [the wife]" is not "an ideal role model."

is the wife. As a consequence of the judge's rulings on the motions and the judgment that ensued, the husband was freed of all obligation to contribute to the wife's support while being left with property held in his name only, including title to the marital home and his investment accounts, as well as his weekly gross salary of $4,512. On the other hand, the wife, at fifty-five years of age and after a total of almost twenty years of marriage to the husband, during which he was abusive to her, was left with various household items, three (at most) Persian rugs, her jewelry, coverage under the husband's medical insurance policy along with the obligation to reimburse him for any additional cost in the premiums, her personal retirement accounts which could not be withdrawn without tax consequences, and her weekly gross income of $549 with which to secure a residence and other necessities for herself as well as to pay off $11,000 in personal loans.

Based on the information before the judge at the time of his rulings, summary of decision, findings, and judgment, and the record before us, we conclude that the judge erred in denying the wife's requests that she be allowed to amend her answer and be relieved of her stipulation.

5. *Conclusion.* So much of the judgment granting the parties' divorce is affirmed. The remainder of the judgment and the orders denying the wife's motion to amend her answer and to be relieved of the terms of her stipulation are reversed. The matter is remanded to the Probate Court for further proceedings which are to include consideration of the validity and enforceability of the antenuptial agreement. The wife's request for appellate attorney's fees is denied.

*So ordered.*