TIMOTHY L. BILIOURIS *vs.* MARY B. BILIOURIS.

No. 05-P-933.

Barnstable. April 11, 2006. - August 17, 2006.

Present: LENK, SMITH, & GRAHAM, JJ.

*Divorce and Separation,* Division of property. *Husband and Wife,* Antenuptial
agreement. *Contract,* Antenuptial agreement.

In a divorce action, the judge did not err in ruling that an antenuptial agree-
ment entered into by the parties three days before their wedding, at a time
when the wife was pregnant, was enforceable, where nothing in the record
indicated that the wife's execution of the antenuptial agreement was the
product of coercion or duress, given that she had sufficient time to review
it and did in fact seek the advice of independent counsel as to its terms
[155-158]; further, the provision in the antenuptial agreement waiving
alimony was fair and reasonable at the time of its execution, and could not
be said to have vitiated the very status of marriage [158-161].
Where the judge in a divorce action did not clearly articulate the rationale for
excluding from the marital estate subject to equitable distribution pursuant
to G. L. c. 208, § 34, the husband's medical office building, this court
remanded for further proceedings and entry of a new or revised order with
respect to the property. [161-163]
In a divorce action, the judge's implicit finding that the husband intended no
gift to the wife of the land on which the marital home was built was not
clearly erroneous. [163-164]

COMPLAINT for divorce filed in the Barnstable Division of the
Probate and Family Court Department on November 1, 2001.

The case was heard by *Robert E. Terry,* J., and postjudgment
motions were also heard by him.

*John B. Hopkins* for Mary B. Biliouris.

*Steven S. DeYoung* for Timothy L. Biliouris.

SMITH, J. In his findings in support of judgments of divorce
nisi, a judge of the Probate and Family Court concluded, inter
alia, that an antenuptial agreement executed by the parties was
fair and reasonable at the time of its execution, was not the
product of coercion or duress, and was not unconscionable at

the time of its enforcement. On appeal, the wife challenges the judge's rulings concerning the enforceability of the antenuptial agreement as well as other aspects of the divorce judgments, including the judge's apparent determination that the husband's medical office building was not a marital asset subject to equitable division pursuant to G. L. c. 208, § 34. We conclude that the judge did not err in upholding the antenuptial agreement but we vacate so much of the judgments as allow the husband to retain title to the medical office building property and remand the matter to the Probate and Family Court in order that the judge may further articulate the rationale for his decision with respect to that property and enter a new (or, if appropriate, revised) order pertaining thereto.

1. *Background and proceedings.* At the time the parties began their dating relationship in mid-1991, the husband, a physician, was thirty-one years of age and the wife, a home economics teacher, was thirty-five years of age. The wife had three children by an earlier marriage. In late September or early October, 1992, the wife learned that she was pregnant and shortly thereafter informed the husband of the pregnancy. Upon receipt of the news, the husband told the wife that he would not marry her unless she signed an antenuptial agreement (agreement). Thereafter, the husband's attorney prepared an agreement that the husband presented to the wife.[1] The wife sought the assistance of counsel who, upon review of the draft agreement, advised the wife not to sign it.

On December 31, 1992, the wife met at a restaurant with the husband and his attorney to discuss the agreement,[2] and immediately thereafter went to a bank where, in the presence of a notary, the parties executed the agreement. On the same date, the parties also signed the exhibits pages listing the parties' assets that were attached to the agreement.

[1]The husband testified that he raised the subject of an antenuptial agreement shortly after learning of the wife's pregnancy and that he presented the wife with the draft agreement approximately two months prior to the parties' wedding on January 2, 1993. The wife testified that the husband broached the subject of an antenuptial agreement in November, 1992, but that she did not see the agreement until approximately one week before the parties' wedding.

[2]It is undisputed that the wife, who at times was crying at the meeting, stated initially that she did not wish to sign the agreement. The husband testified that there were no negotiations concerning the terms of the agreement.

The husband's premarital assets (including stocks, mutual funds, a lot of land in West Barnstable, and a one-bedroom rental condominium in the Allston section of Boston) were worth $986,000; the wife's premarital assets (including her interests in a pending lawsuit and a home in Sandwich in which the parties were then living) were worth $100,000. The parties' financial statements (portions of which were attached to the agreement) reflect that at the time the agreement was executed the husband's gross income was $6,400 per week and the wife's gross income $1,675 per week.[3]

The antenuptial agreement (the pertinent provisions of which are set forth more fully in the margin) provides generally that the individual property of each party, as well as the appreciation thereon, shall remain the party's sole and exclusive property, and that neither party shall have a claim to alimony from the other.[4]

During their ten-year marriage, the parties had two children.

---

[3] The wife's income consisted of her salary as a teacher ($660 per week) as well as Social Security and workers' compensation benefits ($500 per week and $515 per week, respectively) she received on behalf of the three children of her first marriage after the death of her first husband in 1992. The Social Security benefits received by the wife for the benefit of the children were to be reduced proportionately as each child attained the age of eighteen years. The workers' compensation benefits were to be reduced proportionately as each child completed his or her education.

[4] The agreement provides, inter alia:

"1. Except as otherwise may be expressly provided elsewhere in this Agreement, the individual property of each of the parties, both real and personal, now owned by him or her, or which he or she may hereafter acquire or become entitled to, shall remain and be the sole and exclusive property of the owner, subject to his or her individual control and use as if he or she were unmarried. Neither shall acquire by reason of the marriage any interest in the separate property, now or hereafter acquired, of the other or the right to the control thereof, or any interest in the income or any increase in value arising therefrom. . . .

"2. In the event that the marriage of [the husband] and [the wife] shall terminate by reason of their divorce, or if action for legal separation is initiated by either of them, the parties hereby agree that, in view of their respective ages, existing families and issue, and individual assets and income available to each therefrom, neither party shall make any claim against the other for alimony, separate maintenance, or support, or a division or assignment of income or assets of the other as a

By agreement, the wife was a "stay-at-home" mother and was the "primary caretaker of the home" while the husband ran his medical practice. In 1995, the parties sold their home in Sandwich[5] and built a new home, title to which they held as tenants by the entirety, in West Barnstable. The cost of the West Barnstable home (excluding the land) was either $500,000 or $600,000. The husband paid the mortgage on the home (granted in 1999) as well as other extraordinary expenses, and in addition, contributed initially $700 per month (later $1,000 per month) toward the operating expenses of the household. The wife contributed $4,365[6] per month toward the operating expenses of the house. At the time of the divorce, the West Barnstable house was worth $1,075,000 and carried a mortgage of $86,000. During the marriage the parties enjoyed an upper middle class standard of living.[7]

---

part of, or in lieu of, such alimony under the laws of the Commonwealth of Massachusetts or any other jurisdiction.

"3. Each party hereby acknowledges that the agreements contained herein shall constitute a reasonable resolution of any rights they may acquire in the income, asset, or estate of the other in all foreseeable circumstances, including legal separation and termination of the marriage by divorce, giving consideration to their current and future ages, the length of the marriage, and other factors cognizable under Massachusetts General Laws, Chapter 208, Section 34, or similar laws of other jurisdictions."

[5]At the time of the marriage, title to the home was in the wife's name. Shortly after the marriage the wife conveyed the property to herself and the husband as tenants by the entirety and the husband contributed $7,500 to the home (roughly the same amount as the wife's down payment on the home).

[6]This figure was reduced at some point when the wife's oldest child from her previous marriage became emancipated and the wife stopped receiving Social Security benefits on his behalf.

[7]At the time of the divorce, the wife was employed part-time as a teacher's assistant at an elementary school at a salary of $236.40 per week. The wife also received Social Security benefits on behalf of one remaining eligible child of her first marriage in the amount of $255.80 per week and workers' compensation benefits on behalf of her three older children in the amount of $604.65 per week. Although the judge found that the husband's income as reflected on his financial statement was $2,302.60 per week, the judge stated that it is unlikely that the husband, who did not work on Fridays, was suffering the loss he was claiming from his medical practice. The husband presently lives with a female companion who is the facility manager at his medical office clinic and who earns approximately $60,000 per year.

In November, 2001, the husband filed a complaint for divorce, which was amended in August, 2002, to include a provision requesting that the court enforce the terms of the parties' antenuptial agreement "and thereafter . . . make an equitable division of any assets of the parties, the disposition of which is not determined by the terms of said Agreement, such division to be fair and equitable pursuant to the terms of [G. L. c. 208, § 34]." The wife filed an answer and counterclaim requesting, inter alia, that she be granted a divorce on the grounds of cruel and abusive treatment or irretrievable breakdown of the marriage.

After a trial, the judge found that the antenuptial agreement was free from fraud, both parties having fully disclosed their assets at the time of execution, and neither party having unfairly taken "advantage of the confidential and emotional relationship that the party had with the other." The judge further found that the parties had adequate opportunity to consult with independent counsel prior to signing the agreement, that the agreement indicated what rights the parties were giving up, that the wife (who had been through a prior divorce) would be aware of what rights she might have had absent the existence of an agreement, and that there had been "an adequate waiver." Continuing, the judge found "that the [w]ife did not suffer from any duress and was not coerced into signing the agreement at the time of" its execution. Finally, the judge determined that the agreement was fair and reasonable at the time of its execution and was "not an unconscionable agreement" at the time of its enforcement. The judge concluded that the agreement was a binding contract and that there were no countervailing equities that would invalidate it.

By the terms of the judgment of divorce nisi (dated April 11, 2003) that was entered on the husband's complaint, the parties were awarded joint legal and shared physical custody of the parties' two minor children. The husband was allowed to retain his interests in assets worth approximately $1,962,000 (including his interest in the medical office building),[8] while the wife was allowed to retain her interest in assets worth approximately $105,000. In addition, the judge awarded the wife, after adjust-

_____

[8]The judge found that the bulk of the assets could be traced to the husband's premarital assets.

ment, eighty percent of the equity in the West Barnstable home (based on the wife's "contribution" or payment of eighty percent of the household's operating expenses)[9] and most of the contents of the home. The judge also awarded the wife $750 per week as child support and directed the husband to maintain his existing medical insurance for the benefit of the wife, the children of the marriage, and the wife's children from her first marriage for so long as they qualify. Finally, the husband was ordered to maintain at least $500,000 in life insurance on his life, of which the wife was to be listed as beneficiary of $200,000 and each child of the marriage was to be the beneficiary of $150,000. The husband's obligation to maintain life insurance was to terminate upon the emancipation of both children of the marriage. The judge dismissed the wife's counterclaim for divorce.

By orders dated September 29, 2003, the judge denied the wife's motions for new trial and to alter and amend judgment and findings of fact. The judge allowed the wife's motion to revoke the judgment dismissing her counterclaim for divorce. By a judgment dated September 29, 2003, nunc pro tunc as of April 11, 2003, which was identical in all material respects to the judgment that was entered on the husband's complaint, the wife was awarded a divorce for the cause of irretrievable breakdown of the marriage. The wife has appealed from the judgments of divorce nisi and the orders denying her postjudgment motions.

---

[9]As we have stated, the West Barnstable home was worth $1,075,000 at the time of trial. Because the home had been built on a lot for which the husband had paid $93,700 prior to the marriage, the judge deducted that amount from the value of the property (resulting in a sum of $981,300). The judge determined that the husband was entitled to twenty percent of the $981,300 value of the property (based on his twenty percent "contribution" or payment of the household's operating expenses), or $196,260, as well as reimbursement for his payment of $19,543 toward the college costs of one of the wife's children from her first marriage. The judge ordered the husband to transfer his interest in the West Barnstable property to the wife and to pay off the existing mortgage on the property before May 1, 2003. In consideration of the transfer, the judge ordered the wife to execute an unassignable noninterest bearing promissory note in the amount of $309,503 ($93,700 plus $196,260 plus $19,543), secured by a first mortgage, which was to "be due and payable [to the husband] upon the emancipation of the children [of the marriage], the sale of the real estate, or the [w]ife's remarriage, whichever first occurs."

2. *The antenuptial agreement.* To be enforceable, an antenuptial agreement "must be valid at the time of execution and must also be fair and reasonable at the time of divorce." *Austin* v. *Austin*, 445 Mass. 601, 604 (2005). "An antenuptial agreement must also, of course, comport with the rules governing the formation of all contracts, for example, . . . the absence of fraud, misrepresentation, and duress." *DeMatteo* v. *DeMatteo*, 436 Mass. 18, 26 n.16 (2002). See Kindregan & Inker, Family Law and Practice § 20:7 (3d ed. 2002).

a. *Coercion or duress.* The wife argues initially that she was under duress at the time she executed the antenuptial agreement and "was coerced into signing it due to the circumstances in which she found herself."[10] More specifically, the wife asserts that the evidence at trial established that the husband wanted to have children, but given the wife's age, he was concerned that she could not bear children or carry them to term. The wife asserts that there was an oral agreement between the parties where, as a "precondition" of the husband's agreeing to marry her, she would have to become pregnant (which she did).[11] Continuing, the wife asserts that the husband's proposal of an *additional* condition (i.e., the execution of the antenuptial agreement), after she had become pregnant, was coercive in and of itself.

The problem with the wife's argument is that the judge made no finding that any such oral agreement existed between the parties. (The husband vigorously disputed at trial that there was such an agreement.) Indeed, the judge denied the wife's motion to amend findings of fact in which she sought to include findings with respect to the alleged oral agreement.

The wife also asserts, apparently apart from her argument concerning the alleged oral agreement between the parties, that the fact that she found herself, a pregnant single mother, presented with an agreement shortly before her scheduled wed-

---

[10]In her brief and in her oral argument to this court, the wife made no attempt to distinguish legally between the terms "coercion" and "duress" and appears to use them synonymously. See *Delaney* v. *Chief of Police of Wareham*, 27 Mass. App. Ct. 398, 406 n.7 (1989).

[11]The wife claims, in essence, a "prior agreement to marry" where she "completed her obligation [thereunder] by becoming pregnant."

ding date and being told that if she did not sign the agreement there would be no wedding, is by its very nature coercive.[12]

It is settled that a person who enters into a contract "under the influence of such fear as precludes him from exercising free will and judgment" may avoid the contract on the grounds of duress. *Coveney* v. *President & Trustees of the College of the Holy Cross*, 388 Mass. 16, 22 (1983), quoting from *Avallone* v. *Elizabeth Arden Sales Corp.*, 344 Mass. 556, 561 (1962). See *Cappy's, Inc.* v. *Dorgan*, 313 Mass. 170, 174 (1943). See also *Vakil* v. *Vakil*, 66 Mass. App. Ct. 526, 530 n.7 (2006) (although the wife's claim that she executed the antenuptial agreement under duress was not decided, we stated that there was "some support in the record" for the claim where, among other things, the husband was abusive to the wife throughout their marriages and the wife, by affidavit, averred that the husband had coerced her into signing the agreement by threatening to take their son to Iran and prevent her from ever again seeing the child). "Coercion sufficient to avoid a contract need not, of course, consist of physical force or threats of it. Social or economic pressure illegally or immorally applied may be sufficient." *International Underwater Contractors, Inc.* v. *New England Tel. & Tel. Co.*, 8 Mass. App. Ct. 340, 342 (1979), quoting from *Struck Constr. Co.* v. *United States*, 96 Ct. Cl. 186, 220 (1942). Here, we perceive nothing in the record that would cause us to disturb the judge's finding that the wife's execution of the antenuptial agreement was not the product of coercion or duress.

Even were we to assume that the wife was presented with a draft of the antenuptial agreement only one week prior to the parties' wedding (as she claims, see note 1, *supra*), she still had sufficient time to review it, and did in fact seek the advice of independent counsel as to its terms. As we have stated, the wife rejected counsel's opinion that she should not sign the agreement. The wife also acknowledged at trial that prior to executing the agreement and in response to a question posed by the notary, she informed the notary that her signing of the agreement was her "free act and deed." While the wife's pregnancy

---

[12]The wife makes no argument on appeal that her religious or moral beliefs contributed to the alleged coercive atmosphere at the time the antenuptial agreement was executed.

coupled with the husband's insistence that there would be no marriage unless she signed the antenuptial agreement presented the wife with a difficult choice, those factors cannot be said, in the circumstances presented here, to have divested the wife of her free will and judgment.

Other jurisdictions have reached the same result on somewhat similar facts. See, e.g., *Kilborn* v. *Kilborn*, 628 So. 2d 884, 885 (Ala. Civ. App. 1993) (no error in the trial judge's determination that an antenuptial agreement was valid and enforceable and not the product of coercion where the wife, though pregnant, signed the agreement after full disclosure and against the advice of counsel); *Hamilton* v. *Hamilton*, 404 Pa. Super. 533, 537 (1991) (antenuptial agreement not signed under duress where the wife, although "pregnant, unemployed, and probably frightened," was represented by counsel and signed the agreement against his advice).[13] To the extent the wife appeared to suggest at oral argument that duress or coercion may have

---

[13]For additional cases upholding, against claims of coercion, duress, or undue influence, a trial judge's determination that an antenuptial agreement executed by a woman who was pregnant was valid, see *In re Marriage of Dawley*, 17 Cal. 3d 342, 355 (1976); *Herrera* v. *Herrera*, 895 So. 2d 1171, 1173, 1175 (Fla. App. 2005); *Mallen* v. *Mallen*, 280 Ga. 43, 45-46 (2005); *Osorno* v. *Osorno*, 76 S.W.3d 509, 511 (Tex. App. 2002) (reasoning that because duress consists of a threat to do something a party has no legal right to do, and because the father had no legal duty to marry the pregnant mother, "[h]is threat to do something he had the legal right to do is insufficient to invalidate the premarital agreement"). Other appellate cases we have located in our research, in which courts have found coercion or duress (or that genuine issues of material fact existed as to whether there was coercion) in circumstances where, among other factors, an antenuptial agreement was executed by a pregnant woman, are distinguishable from the case at bar. In *Holler* v. *Holler*, 364 S.C. 256, 266-268 (Ct. App. 2005), the court, in concluding that the wife, who was from the Ukraine, did not enter into the premarital agreement freely and voluntarily, noted that not only was the wife pregnant at the time she executed the premarital agreement, but her visa was about to expire (thus requiring her to leave the United States unless she married), she could not understand the agreement, and she had no money of her own to retain or consult with an attorney or a translator. In *Williams* v. *Williams*, 617 So. 2d 1032, 1035 (Ala. 1992), the court held that summary judgment was inappropriate as the testimony in the case created genuine issues of material fact as to whether, among other things, the "the father's conditioning the marriage on the pregnant mother's signing the antenuptial agreement, joined with the mother's moral objection to abortion and the importance of legitimacy in a small town, created a coercive atmosphere in which the mother had no viable alternative to accepting the father's condition for marriage, i.e., signing the agreement."

resulted in this case from the prospect of her being a single mother and the economic circumstances that may flow therefrom, the husband testified that he informed the wife that even if she did not sign the agreement he would act as a father to the child and would support the child financially. In any event, even if the husband did not make that statement, a court may enter an order for the support of a child born out of wedlock pursuant to G. L. c. 209C, § 9.[14]

b. *Validity of alimony waiver.* The wife argues next that under the circumstances known and reasonably to be anticipated by the parties at the time of the execution of the antenuptial agreement, the waiver of alimony provision, as to her, was neither fair nor reasonable when it was made.[15]

"Antenuptial agreements that waive alimony are not 'per se

---

[14]There is no merit in the wife's additional arguments that she had no way to verify the husband's disclosures concerning the existence and values of his assets in exhibit A to the parties' agreement (or to correct errors concerning her own assets listed in exhibit B), and that she was coerced into signing the exhibits. As to the former point, the wife does not argue that the husband's disclosures were incorrect in any material respect, and in fact, her attorney stated at trial: "We'll stipulate that the [husband's] assets as listed, we have no reason to dispute their value except [in minor respects] for the ring." It is also not clear why the wife was unable to correct the value of her own assets appearing in exhibit B if they were, in fact, incorrect. In any event, the wife indicated during cross-examination at trial that the assets and values in exhibit B were substantially correct; her primary complaint was that her furniture, appliances, and other miscellaneous personal property were worth less than the $10,000 figure reflected in the exhibit. As to the latter point, we cannot say that the wife's execution of the exhibits was the product of coercion or duress. We note also that the wife's terse and sketchy assertions in the initial section of her brief that touch on the fairness and reasonableness of the agreement do not constitute argument within the meaning of Mass.R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975). We address the fairness and reasonableness of the agreement in our discussion, *infra*, of the validity of the wife's waiver of alimony.

[15]The wife made clear at oral argument that she was challenging the fairness and reasonableness of the agreement at the time of its execution and not its conscionability at the time of enforcement (the so-called "second look" during which a judge determines whether "due to circumstances occurring during the course of the marriage, enforcement . . . would leave the contesting spouse 'without sufficient property, maintenance, or appropriate employment to support' herself." *DeMatteo* v. *DeMatteo*, 436 Mass. at 37, quoting from 1 Clark, Jr., Domestic Relations in the United States § 1.9 [2d ed. 1987]. *Austin* v. *Austin*, 445 Mass. at 604. *Korff* v. *Korff*, 64 Mass. App. Ct. 94, 97 [2005]).

against public policy and may be specifically enforced.' " *Austin* v. *Austin*, 445 Mass. at 603-604, quoting from *Osborne* v. *Osborne*, 384 Mass. 591, 598 (1981). *Vakil* v. *Vakil*, 66 Mass. App. Ct. at 536. As we have stated, however, to be enforceable, an agreement must be valid at the time of execution. "In order [for such an agreement] to be valid at the time of execution, the judge must determine whether '(1) [the agreement] contains a fair and reasonable provision as measured at the time of its execution for the party contesting the agreement; (2) the contesting party was fully informed of the other party's worth prior to the agreement's execution, or had, or should have had, independent knowledge of the other party's worth; and (3) a waiver by the contesting party is set forth.' " *Austin* v. *Austin*, 445 Mass. at 604, quoting from *DeMatteo* v. *DeMatteo*, 436 Mass. at 26.

In determining whether an agreement was fair and reasonable at the time of execution, reference may be made to numerous factors, including "the parties' respective worth, . . . ages, . . . intelligence, literacy, and business acumen, and prior family ties or commitments." *Rosenberg* v. *Lipnick*, 377 Mass. 666, 672 (1979). *Austin* v. *Austin*, 445 Mass. at 604. See *DeMatteo* v. *DeMatteo*, 436 Mass. at 30 (reasonableness of the monetary provision in an antenuptial agreement "cannot ultimately be judged in isolation"). "It is only where the contesting party is essentially stripped of substantially all marital interests," and indeed, the terms of the agreement "essentially vitiate the very status of marriage," that an agreement is not fair and reasonable. *Id.* at 31.

Here, the judge did not err in concluding that the waiver of alimony provision of the antenuptial agreement was fair and reasonable at the time of its execution. The wife was an educated professional who had a demonstrated earning capacity at the time she executed the agreement in 1992. Although the parties agreed that the wife would leave her job in order to be a "stay-at-home" mother, there is nothing in the record to suggest that the wife would be incapable of working and earning income to support herself in the event of a divorce in the future.[16] Moreover, as we have discussed, the agreement provided that

---

[16]The wife had shown the ability to work full time prior to the parties' mar-

the wife's separate premarital property (valued at approximately $100,000), and any appreciation thereon, would remain her property and not be incorporated into the marital estate subject to division.

The agreement (in the absence of any limitation or provision to the contrary) also permitted the wife an interest in marital assets accrued by the parties during the marriage. As the husband owned no home at the time the agreement was executed (and was residing with the wife and her three children in the wife's home in Sandwich), and as the agreement specifically provided "that, in the event of their marriage, the parties *expect to reside* together *in a location*, style and manner mutually suitable to them"[17] (emphasis supplied), it was reasonably foreseeable that the parties would acquire a home in which to raise the combined families and that at least some portion of this asset would be available for the wife's support if the parties ultimately divorced. See *Austin* v. *Austin*, 445 Mass. at 606.[18] In the circumstances presented, the parties' agreement cannot be said to have vitiated the very status of marriage.[19] If the terms of the agreement were unsatisfactory to the wife, she was "free not to marry." *DeMatteo* v. *DeMatteo*, 436 Mass. at 33.

riage (and shortly thereafter) notwithstanding the fact that she had three children under the age of eleven from her first marriage. The wife was also receiving at the time she executed the agreement $1,015 per week for the benefit of her children by her first marriage and anticipated receiving substantial sums for their benefit for many years to come. See note 3, *supra.*

[17] It seems implicit in this provision of the agreement that the parties anticipated residing in a location other than the home in Sandwich. We note that the agreement further provides: "If separation or divorce proceedings are commenced by either party against the other at a time when either is living in any house or apartment that had been initially obtained by the other, then at the request of the party who had initially obtained such residence, he or she thereupon will immediately vacate the same and remove all of his or her personal possessions therefrom."

[18] Although the agreement in the present case contains no provision, as in *Austin,* that the husband would assist the wife with support if there were no jointly owned marital home at the time of the divorce, we think the circumstances in this case, in their entirety, support the finding that the agreement was fair and reasonable.

[19] As to the two remaining factors set out in *Austin* v. *Austin,* 445 Mass. at 604, the wife, as we have indicated, was fully informed of the husband's worth at the time of the execution of the agreement, and the agreement sets forth a waiver by the wife of various spousal rights.

3. *The medical office building.* The wife argues that the judge erred in failing to include within the marital estate subject to equitable division pursuant to G. L. c. 208, § 34, the husband's medical office building in South Dennis, held in the husband's name alone, which has a stipulated present value of $450,000.

At trial, the husband testified that he purchased the medical office building in August, 1999, for $350,000, using premarital assets that originated in a Vanguard fund. He testified further that although the parties took out a $240,000 mortgage on the marital home in July, 1999 (there was no mortgage on the house prior to that time), he did not believe that the proceeds were used for the purchase of the medical office building.[20] Rather, he stated that the mortgage funds were first put into a money market account to which the wife had no access and were later used for investments, including his purchase of an interest in a railroad. The wife testified to the contrary, stating that the mortgage was taken out to buy the medical office building and explaining that the husband had informed her that it was less expensive to get a home mortgage than a commercial mortgage.

The judge's findings with respect to the medical office building are, at best, unclear. Although the judge found, consistent with the husband's testimony, that "[t]he [h]usband "paid $350,000.00 for [the medical office building] property which originated from the Vanguard [a]ccount," he also found, consistent with the wife's testimony, that the parties took out

---

[20]At the commencement of trial, the judge read into the record an agreed statement of facts prepared by the parties. One of the agreed facts was that the mortgage on the marital home "was originally taken out for $90,000 and the proceeds of which were used in part to fund the husband's purchase" of the medical office building. After the wife's attorney informed the court that the original mortgage was $240,000, the husband's attorney indicated that the stipulation could be revised, stating his belief (with apparent agreement of the husband) that "what happened was $240,000 was used to purchase the [medical office] building and it was then paid down to $90,000 and they refinanced it to get a lower interest rate." The judge then stated that the stipulation would read that the mortgage on the West Barnstable property "was originally taken out in the amount of $240,000. Currently $90,000." The wife's attorney responded: "That's correct and the proceeds were used at least in part *and that's a matter of contention*" (emphasis supplied). At trial, the husband testified that to the extent the stipulation stated that the proceeds of the mortgage were used in part to fund the purchase of the medical office building, he did not believe it was accurate.

the mortgage on the West Barnstable property in order to purchase the medical office building and that the husband "us[ed] the mortgage and other premarital funds" to buy the building.[21,22] If, in fact, the mortgage funds (for which the marital home was placed as security) were used to purchase the medical office building, and the mortgage was paid through the husband's earnings and income during the marriage, the judge's findings do not make clear why the property was excluded (as it apparently was) from the marital estate subject to division under § 34. Nor do the judge's findings make clear the basis for his decision to allow the husband to retain title to the property.

In the circumstances, we vacate the order concerning the medical office building property and remand the matter to the Probate and Family Court so that the judge may better articulate

---

[21]The judge found, in addition, that the net profits of $25,000 from the sale of the Sandwich home in 1995 "went into the marital home," that the money for the construction of the marital home was generated by the parties during the marriage from their respective incomes, and that the $240,000 mortgage on the marital home (which was reduced to $86,000 at the time of trial) was paid by the husband from his "income" and "rental income." (The husband testified, among other things, that he aggressively paid the mortgage down through his "earnings"; the wife testified that the mortgage was paid with rental income received from the medical office building).

[22]It is undisputed that both the husband and the wife signed the mortgage documents. "[I]n Massachusetts, the granting of a mortgage vests [legal] title in the mortgagee to the land placed as security for the underlying debt," while equitable title is retained by the mortgagor. *Maglione* v. *BancBoston Mort. Corp.*, 29 Mass. App. Ct. 88, 90 (1990). See *Teschke* v. *Keller*, 38 Mass. App. Ct. 627, 634 (1995); *McLaughlin* v. *Amirsaleh*, 65 Mass. App. Ct. 873, 883 (2006). The husband testified that he did not remember why he did not put the wife's name on the medical office building property.

On appeal, the husband does not appear to argue that the disposition of the medical office building turns on his sole ownership of the property. Rather, while acknowledging that the mortgage was taken out and used (together with "other premarital funds") to fund the purchase of the medical office building, he justifies the court's award on the ground that the building "was purchased with his own premarital funds whether characterized as a mortgage on the marital home or through his investment accounts" and that "[i]t is a fiction to suppose that the marital home, found to be a marital asset, was anything more than a convenient vehicle for [him] to fund the purchase without dedicating his investment monies to this enterprise, which he could have done." He also asserts that the wife failed to contribute in any way to the financing of the purchase of the medical office building and that it has never been part of the marital estate.

the rationale for his treatment of the property and enter a new (or, if appropriate, revised) order with respect to the property.

4. *Alleged gift of real estate.* In arguing that the judge erred in dividing the equity in the West Barnstable home, the wife asserts that the husband should not have received a credit in the amount of $93,700 for the value of the land on which the house was built as the husband had gifted an interest in the land to her when he executed, delivered, and recorded the deed conveying the West Barnstable property from himself to the parties as tenants by the entirety.

At the outset, it is doubtful that the wife's brief assertions on the point, which are unsupported by citation to relevant authority, rise to the level of argument contemplated by Mass.R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975). Even were we to overlook the deficiencies in the wife's argument, however, we would not disturb the court's judgment with respect to the "credit."

The antenuptial agreement does not prohibit the parties from "giving, devising, or bequeathing any of his or her property to the other by will, gift, or otherwise." Even assuming that the husband's deeding of the West Barnstable property to himself and the wife as tenants by the entirety created a presumption that there was a gift to the wife of an interest in the land, such a presumption is rebuttable. See, e.g., *Osborne* v. *Osborne*, 384 Mass. at 602; *Ross* v. *Ross*, 2 Mass. App. Ct. 502, 508-509 (1974), cert. denied, 420 U.S. 947 (1975). Here, the husband took a position at trial that is inconsistent with the view that he intended to make a gift to the wife of an interest in the value of the land itself. He testified essentially to his understanding that the value of the West Barnstable land that he brought into the marriage and later "commingled" with the assets belonging to him and the wife was protected under the terms of the antenuptial agreement and that he was entitled to reacquire the value of the land as of the date that he "signed it over [as] a marital asset" in 1995.[23]

Although the judge did not make a specific finding concern-

---

[23]Although the husband opined at trial that the West Barnstable land was worth $200,000 in 1995, the judge credited him with the value of the property as of the date the antenuptial agreement was signed.

ing the husband's donative intent with respect to the land on which the marital home was built, we think it is implicit in his rationale and his issuance of a credit to the husband that he determined that no gift was intended. The judge also denied the wife's request to amend findings of fact to reflect that the husband's conveyance to her of an interest in the West Barnstable land "was a voluntary act on the part of the [h]usband and therefore a gift which removed the land as an asset under the purv[iew] of the [a]ntenuptial [a]greement." While it would have been helpful to our review (particularly in the face of the joint title) if the judge had made more detailed findings on the question, the judge's implicit finding with respect to the West Barnstable land is consistent with the parties' antenuptial agreement and cannot be said to be clearly erroneous.

5. *Failure to grant divorce on grounds of cruel and abusive treatment.* Upon consideration of the arguments raised by the wife, and in view of the wife's request for a divorce, alternatively, on the grounds of cruel and abusive treatment or an irretrievable breakdown of the marriage, we cannot say that the judge erred by failing to grant the wife a divorce on the grounds of cruel and abusive treatment.

6. *Additional challenges to findings and judgments.* It is clear that the judge, on conflicting evidence, rejected the wife's claim that the parties agreed that in exchange for the wife paying the majority of the household expenses, the husband would accumulate funds to be used for the education of all the children, including her children from her first marriage. We perceive nothing in the wife's other arguments that would cause us to disturb further the judgment.

7. *Conclusion.* So much of the judgments of divorce nisi as allow the husband to retain title to the medical office building in South Dennis (paragraph 25 of each of the judgments) are vacated and the matter is remanded to the Probate and Family Court with instructions that the judge articulate the rationale for his treatment of the property and enter a new (or, if appropriate, revised) order with respect to the property.[24] The judge may

---

[24]That part of the order requiring the husband to be solely responsible for the "homeowner's" insurance and real estate taxes on the medical office

hold such further hearing(s) as he deems necessary. In all other respects, the judgments are affirmed.

*So ordered.*

---

building shall remain in effect as a temporary order.